9 A.3d 1179

**In the Interest of R.J.T., a Minor.**

**Appeal of R.T. (Natural Mother).**

Supreme Court of Pennsylvania.

Argued Oct. 19, 2010.

Decided Dec. 28, 2010.

10

12

Benjamin Nelson Zuckerman, Esq., Juvenile Court Project, for R.T., appellant.

Mark B. Greenblatt, Esq., Allegheny County Law Dept., for Allegheny County Children, Youth and Families, appellee.

Judith Ellen Patterson, Esq., KidsVoice, for R.J.T., appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN, JJ.

## *OPINION*

Justice BAER.

This case comes before this Court as a Children's Fast Track matter involving the potential change of the goal of a dependent child's permanency plan from reunification with his parents to adoption. We granted review to consider whether the Superior Court erred in determining that the trial court abused its discretion in denying the goal change requested by the Allegheny County Office of Children, Youth, and Families ("CYF"). Upon review, we conclude that the Superior Court erred. Accordingly, we reverse the Superior Court's decision and reinstate the trial court's order.

On January 23, 2007, less than a month after his birth, R.J.T. ("Child") was removed from his parents' care following an incident of domestic violence between R.T. ("Mother") and J.T. ("Father") (collectively, "Parents"). Initially, Child was placed with his paternal grandmother. In February 2007, the trial court adjudicated Child dependent based on the domestic violence concerns and Parents' drug and alcohol use, and placed Child in foster care. A Family Service Plan ("FSP") was developed by CYF to address the domestic violence, drug, and alcohol issues that led to Child's placement. Permanency review hearings were held in May 2007, August 2007, December 2007, March 2008, June 2008, and August 2008, and, relevant to the current appeal, in January 2009, pursuant to 42 Pa.C.S. § 6351.

During this time, Child resided with foster parents ("Foster Parents").[1] Foster Parents, however, filed a request in Octo-

---

1. The trial court did not make a specific finding regarding the number of foster homes in which Child has been placed. The record, however,

ber 2008 for Child's removal from their home citing Child's difficult behavior, including three-hour temper tantrums, Father's recent release from prison,[2] and pressure from Foster Parents' extended family. Notes of Testimony ("N.T."), 1/23/09, at 63. Foster Parents withdrew their request for removal the following month, citing a reduction in the duration of the temper tantrums and Child's increased ability to communicate his needs. N.T. at 63.

The relevant permanency review hearing was held on January 23, 2009, exactly two years after Child's initial removal from Parents' care. As of that date, Child resided with Foster Parents, who did not testify at the hearing; however, CYF represented that Foster Parents desired to pursue adoption of Child, despite the recently recanted request for removal of Child from their home. Mother and Father were married but not living together at the time of the hearing, and Mother had recently requested modification of a Protection From Abuse ("PFA") order to allow contact with Father, which would permit marriage counseling.[3] Additionally, Mother was pregnant with another man's child. Testimony was presented that Mother was working full-time and living on her own. She also stated that she was trying to make all her appointments but had difficulty coordinating her work schedule, her domestic violence counseling with Pittsburgh Action Against Rape, her mental health counseling, and her visits with her son. N.T. at 110–113. Father testified that he was pursuing many of his goals and that he hoped to reunify as a family with Mother, Child, and Mother's expected child. N.T. at 139. Father also testified that he had approximately seventy days left on probation with no pending charges and that he was attempting

suggests that Child has not been with the same foster family over the course of his placement, and, indeed may have been with three separate families. Notes of Testimony ("N.T."), 1/23/09, at 47.

2. Father was incarcerated for most of 2008 and released in late September 2008.

3. Although not emphasized by the trial court, Mother, Father, and the court appointed psychologist testified that CYF provided conflicting signals to Parents, instructing them to attend marriage counseling but also faulting Parents for violating the PFA in their attempts to receive marriage counseling. N.T. at 168–169 (summarizing prior testimony).

to find employment and to move out of his mother's house. N.T. at 140, 149.

Evidence was presented that Child visited with both Mother and Father.[4] Father acknowledged that he had only visited Child twice in the past year, due to his incarceration and his inability to afford the cost of a deputy sheriff, which was required for his visits under a prior trial court order.[5] CYF presented testimony that the visits with both Mother and Father had been successful and that Child interacted well with Mother and Father. N.T. at 60. Dr. Neil Rosenblum, the court-appointed psychologist, testified that he performed interactional interviews between Father and Child and between Mother and Child, as well as individual interviews with Mother. Dr. Rosenblum testified that during the interaction with Child, Father was warm and nurturing, and was very invested in Child. N.T. at 21. The psychologist observed that Father came prepared with age-appropriate toys for Child and exhibited intuitive skills and enthusiasm for interacting with Child. N.T. at 21. Dr. Rosenblum further noted that Child interacted happily with Father. N.T. at 21–22. Dr. Rosenblum also testified that Mother "has very good parenting skills." N.T. at 18.

Testimony revealed that Mother and Father had made some progress toward addressing their domestic violence and drug and alcohol problems, as well as their other goals. CYF, however, emphasized that Parents had not attained all the goals at the time of the hearing, as discussed below.

4. According to the records before this Court, generally, the trial court granted Mother visitation for approximately six hours per week over the course of Child's placement. Father has had more limited visits, especially during his incarceration. Additionally, Child's paternal grandmother had regular visits with Child.

5. On May 25, 2007, the court ordered Father to pay for a deputy sheriff to be present at each of his supervised visits with Child, scheduled for twice a month, apparently due to threats Father made against CYF workers. Presumably, the order did not apply when Father was incarcerated in 2008. Furthermore, the trial court lifted the requirement of a deputy sheriff's presence in its January 23, 2009 order, based upon the court-appointed psychologist's recommendation to that effect. N.T. at 23.

■ At the hearing, CYF made an oral motion for a permanency plan goal change from reunification with Parents to adoption.[6] N.T. at 165. KidsVoice, the guardian *ad litem* for Child, joined the goal change request. Counsel for CYF asserted that CYF would continue to provide services to Mother and Father in the event of a goal change to adoption. Mother and Father objected to the goal change and testified to their strong desire to be reunited as a family with Child.

Dr. Rosenblum recommended dual-tracking, also known as concurrent planning. In *In re Adoption of S.E.G.*, 587 Pa. 568, 901 A.2d 1017, 1019 (2006), we observed that concurrent planning "is a dual-track system under which child welfare service agencies provide services to parents to enable their reunification with their children, while also planning for alternative permanent placement should reunification fail." Dr. Rosenblum testified that Mother and Father were actively pursuing their goals and that reunification was still possible despite continuing serious issues. N.T. at 9–11. Conversely, Dr. Rosenblum recognized that Child had been in placement for an extended time, which would counsel in favor of a goal change, but noted that Foster Parents' recent filing and recantation of their request to remove Child from their home raised doubts about their commitment to Child. N.T. at 9–11. Premised upon these concerns, Dr. Rosenblum testified that he would like to conduct further evaluations of Foster Parents. After considering Dr. Rosenblum's testimony and the other

6. We note that the trial court's permanency review order of August 15, 2008 indicated that a "goal change" would be discussed at the January 2009 permanency hearing. Although the relevant statutory provisions do not reference the phrase "goal change," the parties and the courts in this case and numerous prior cases use the phrase as a term of art. Moreover, the concept of a "goal change" is consistent with 42 Pa.C.S. § 6351(g), which requires the trial court, at the conclusion of a permanency hearing, to "order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." We conclude that an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. Accordingly, we will use the terminology of "goal change" as it has developed in case law and is employed in common parlance.

evidence presented, the trial court denied the motion for goal change for the reasons set forth below.

■ In considering the goal change motion, the trial court correctly observed that it had a "responsibility to look to the best interests of Child and not those of Child's parents." Tr. Ct. Op. at 4; *see, e.g.,* 42 Pa.C.S. § 6351(g). Noting that the relevant statute, 42 Pa.C.S. § 6351(f.1), provided several permanency plan options for Child, including reunification and adoption, the court opined that reunification is the "preferred option" and that "[i]n order for the goal to be changed to adoption, it must be proven that this option is best suited to the child's safety, protection, and physical, mental, and emotional welfare and reunification is not the best option." Tr. Ct. Op. at 4. The court further viewed the law to require that "when the parents of a dependent have cooperated with [the] child welfare agency, achieved the goals of their permanency plans, and alleviated the circumstances that necessitated the child's original placement, the agency should continue to put forth efforts to reunite the child with [his] parents." Tr. Ct. Op. at 4–5.

The trial court determined, based on the facts at the time of the hearing, that "reunification is best suited to Child's safety, protection and physical, mental, and emotional welfare and adoption is not best suited for several reasons." Tr. Ct. Op. at 5. As the first reason for its conclusion regarding adoption, the court stated that "it is uncertain whether Foster Parents are fully dedicated to Child, thus calling into question the long-term stability of Child's current placement." Tr. Ct. Op. at 5. As evidence to support its finding, the court noted that "Dr. Rosenblum testified that the [October 2008 notice requesting removal of Child] changed his opinion of the situation and [that Dr. Rosenblum] would want to conduct further evaluations with Foster Parents and Child to determine if this home is the best fit for Child." Tr. Ct. Op. at 5. The court also expressed concern regarding the "pressure exerted by [Foster Parents'] extended family [that] shows that the extended family does not have a close relationship with Child or

see him as part of the family, which could be detrimental to the emotional and mental welfare of Child." Tr. Ct. Op. at 5.

As a second reason for rejecting the goal change to adoption, the trial court found that "both Father and Mother have been adamant in their pursuit to regain custody of Child by working toward their Family Service Plan (FSP) goals and become a family." Tr. Ct. Op. at 5. The trial court was not blind to issues that remained as obstacles to reunification including Mother and Father's history of domestic violence. The court, however, noted that Father had attended a seventeen-week anger management and domestic violence class and that Mother intended to withdraw the PFA order she attained against Father to allow them to attend marriage-counseling classes together. The court also observed that both Mother and Father had attended at least some of the required behavioral health therapy sessions. In addition, the trial court noted that Father testified that he would treat Mother's unborn child (for which he was not the biological parent) as his own, if reunification was granted. The court emphasized evidence, some of which was introduced by CYF, indicating that both Mother and Father interacted well with Child and showed positive parenting skills. The court also noted that Mother had attained her goals of securing housing and full-time employment.

The court concluded, "the best interests and permanent welfare of Child at this time is to not change the goal to adoption, but for the goal to remain reunification." Tr. Ct. Op. at 7. Although the court did not use the term "concurrent planning" in the phrasing of its conclusion, his final two sentences address the consideration of two tracks for Child. First, the court observed that not changing the goal would allow Mother and Father to come into full compliance with their FSP goals. Second, the court noted that not changing the goal would also allow "additional time to satisfy this Court's serious concerns about the permanence of Child's current placement and Child's attachment to Foster Parents." Tr. Ct. Op. at 7. Nothing in the trial court's order or opinion

closed the door to CYF's pursuit of the goal of adoption through termination proceedings.

CYF appealed the denial of the goal change to the Superior Court, asserting that the trial court had abused its discretion in denying the goal change motion for a two-year-old child who had been in placement for twenty-two months. In a published opinion of a three-judge panel with one dissenting judge, the Superior Court reversed and remanded for entry of an order changing the goal to adoption. *In re: R.J.T.*, 990 A.2d at 788.

The Superior Court stated that the proper standard of review in dependency cases is whether the trial court abused its discretion, noting that the appellate court must accept the facts as found by the trial court, unless they are not supported by the record, but that the court is not bound by the trial court's inferences or legal conclusions. *Id.* at 780; *see also, e.g., In re D.P.*, 972 A.2d 1221, 1225 (Pa.Super.2009); *In re S.B.*, 208 Pa.Super. 21, 943 A.2d 973, 977 (2008). As did the trial court, the Superior Court emphasized that the focus at a permanency plan hearing is on the best interests of the child, not the parent. Further, the court stated that the burden of proof is on the agency seeking the goal change.[7]

The Superior Court next turned to the statutory require-ments of the Juvenile Act for disposition of a dependent child as set forth in 42 Pa.C.S. § 6351, with special focus on the dictates of subsection (f).[8] It noted that § 6351 requires trial

7. This Court has never addressed allocation of the burden of proof in a goal change scenario. The parties do not challenge this premise, and so we accept it for purposes of this matter, without critically assessing it.

8. In full, 42 Pa.C.S. § 6351(f) provides:
   (f) Matters to be determined at permanency hearing.-At each perma-nency hearing, a court shall determine all of the following:
   (1) The continuing necessity for and appropriateness of the place-ment.
   (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
   (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

courts to conduct a "permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(e)(1). The Superior Court observed that § 6351(f), requires trial courts to consider numerous, specified matters at each permanency hearing, including subsection (f)(9), which serves as a focal point of the current appeal:

(f) Matters to be determined at permanency hearing.—At each permanency hearing, a court shall determine . . .

(9) *If the child has been in placement for at least 15 of the last 22 months* or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

(8) The services needed to assist a child who is 16 years of age or older to make the transition to independent living.

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

preserve and reunify the family need not be made or continue to be made, *whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child. . . .*

42 Pa.C.S. § 6351(f)(9) (emphasis added, language omitted relating to exempted circumstances not applicable to the case at bar).

In summarizing the state of the law, the Superior Court extensively quoted the decision of this Court in *In re S.E.G.*, 587 Pa. 568, 901 A.2d 1017, in which we addressed the incorporation of concurrent planning into Pennsylvania's Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, pursuant to the Federal Adoption and Safe Families Act of 1997, Pub L. 105–89 ("ASFA"). As previously stated, concurrent planning involves a dual-track system by which agencies are encouraged to provide simultaneous services aimed at both reunification and adoption. *Id.* at 1019. In *In re S.E.G.*, we observed that concurrent planning developed to address the problem of foster care drift, where children languished in the foster care system while their parents unsuccessfully attempted to regain custody. *Id.* Rather than waiting to pursue adoption options until all reunification attempts fail, concurrent planning allows children to move more quickly through the dependency system and into the permanent placement best suited to their individual situation through simultaneous pursuit of reunification and alternative permanent placement. Specifically, we held that agencies could file termination of parental rights petitions, in furtherance of adoption, even though the permanency goal remained reunification. *Id.* at 1029.

The Superior Court in the case at bar also quoted prior Superior Court cases holding that the decision to change a permanency plan goal from reunification to adoption signals that the court has decided that the agency "has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. Once the goal is changed to adoption, [the agency] is not required to provide further

services." [9] *In re: R.J.T.*, 990 A.2d at 786 (internal citations and quotation marks omitted).

The Superior Court concluded that the trial court "failed to follow the legal principles set forth in § 6351(f) and (f.1)[10] of

9. We acknowledge that the Superior Court has long held that a goal change releases an agency from the obligation to supply additional reunification services, absent a contrary court order. Moreover, we recognize that public policy supports the Superior Court's position given the need to channel limited agency resources to services that will provide the most benefit to the dependent child. Our research, however, discloses nothing in Federal or Pennsylvania statutory law or this Court's jurisprudence specifically stating that a decision to change a permanency plan goal to adoption permits an agency to stop providing services to the parents. In fact, ASFA's designation of when reasonable efforts are not required does not reference goal change as one of those instances. 42 U.S.C. § 671(a)(15)(D) (specifying that services are not required in situations including where the parent has subjected the child to aggravated circumstances as defined by statute, the parent has murdered another child of the parent, and termination of parental rights to a sibling). Rather, generically, ASFA provides that "reasonable efforts shall be made to preserve and reunify families," and specifically contemplates concurrent planning: "reasonable efforts to place a child for adoption ... may be made concurrently with reasonable efforts of the type described in subparagraph (B) [reunification of families]." 42 U.S.C. § 671(a)(15)(B), (F). As the question regarding the effect of a goal change was not encompassed in our grant of allocatur, the parties consequently have neither briefed nor argued it. Thus, we leave for another day the question of whether a cessation of funding for reunification services is a condition subsequent to a goal change. Moreover, we note that CYF in the case at bar asserted to the trial court that it would continue providing services, and thus allow for concurrent planning in the event the court had granted the goal change.

10. 42 Pa.C.S. § 6351(f.1) provides as follows:

(f.1) Additional determination.—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.
(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian

the Juvenile Act ... and in particular subsection (f)(9)." *Id.* at 787. Specifically, the Superior Court claimed that the trial court "failed to set forth the basis for its conclusion that the continuation of reunification as a permanency goal was best suited to the safety, protection and physical, mental and moral welfare of the child." *Id.* This assertion by the Superior Court, however, ignores the three pages of the trial court's opinion discussing the "several reasons" for its decision that reunification was best suited for Child, as summarized *supra* at 15–19, 9 A.3d at 1183–85. The Superior Court also discredited the trial court's consideration of Foster Parents' commitment because the statutory provision of § 6351(f) does not mention consideration of potential adoptive resources, apparently not recognizing that subsection (f.1) requires the consideration of "all relevant evidence presented at the hearing", and 6351(g) mandates a determination of which placement alternative is best suited for the child, which clearly could include consideration of potential adoptive resources.

The Superior Court instead discussed testimony in the record, not relied upon by the trial court, supporting a change of goal to adoption. The testimony emphasized by the Superior Court indicated that Parents had not met all of their FSP goals and that problems remained between them, facts the trial court actually considered in making its determination. Despite quoting the trial court's statement during the hearing that the case involved a "very close call," the Superior Court found that the trial court abused its discretion in not granting the goal change to adoption. *Id.* at 787. In so doing, the Superior Court essentially ignored the effect of the trial

or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child. (4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned

court's order, which provided for concurrent planning by encouraging continued efforts at reunification between Child and Parents while also contemplating the appropriateness of adoption.

To support its contrary conclusion, the Superior Court emphasized the language of § 6351(f)(9). As previously stated subsection (f)(9) provides in relevant part: "At each permanency hearing, a court shall determine . . . [i]f the child has been in placement for at least 15 of the last 22 months, . . . whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child."[11] 42 Pa.C.S. § 6351(f)(9). The Superior Court seemingly interpreted this language to require the trial court to change the goal to adoption if the child had been in care for fifteen of the past twenty-two months and reunification was not imminent. *In re: R.J.T.*, 990 A.2d at 788 ("After Child had been removed and placed in care for 15 of the preceding 22 months and the parents were not ready for reunification, the trial court committed an abuse of its discretion in refusing to change the goal from reunification to adoption pursuant to [§ 6351(f)(9) ]."). The Superior Court noted prior caselaw supporting the need for the child welfare agency and the courts to move a child toward adoption if reunification efforts have been unsuccessful, apparently not recognizing that concurrent planning allows an agency to move toward adoption and termination of parental rights while still maintaining a goal of reunification. Accordingly, the Superior Court concluded that the trial court abused its discretion in failing to change the permanency plan goal to adoption, reversed the trial court's order, and remanded for entry of an order changing the goal to adoption.

Judge Ford Elliott dissented, concluding that the trial court was "clearly within its discretion" when it denied the motion to change the goal to adoption based upon its determination "that the parents are continuing to make progress, there

> to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

11. *See supra* at 20 n. 8, 9 A.3d at 1186 n. 8 for full text of 42 Pa.C.S. § 6351(f).

clearly exists a bond between parents and child, and there is no pending adoptive resource to otherwise bring about permanency for the child." *In re: R.J.T.*, 990 A.2d at 788 (Ford Elliott, J. dissenting).

Mother filed a petition for allowance of appeal to this Court. We granted review and rephrased the issue: "Whether the Superior Court erred in determining the trial court abused its discretion in denying CYF's permanency goal change request from reunification to adoption." *In re: R.J.T.*, 996 A.2d 481 (Pa.2010).

Mother argues that the Superior Court erred in not crediting the factual determinations of the trial court upon which the court based its conclusion that a goal change was not best suited for Child. Moreover, she asserts that the Superior Court improperly focused on § 6351(f)(9), which is just one of many factors a trial court must consider in determining whether a goal change is best suited to the child. Additionally, she observes that the section merely requires the court to determine whether CYF has filed a termination petition if the child has been in placement fifteen of the last twenty-two months or whether the child fits into an exception. She emphasizes that there is no language in the statute requiring the trial court to grant a goal change based merely on the child being in placement for the fifteen-month period. She contends that the Superior Court's holding mandates a goal change based on this one factor, which she claims undermines the statutory language requiring the court to focus on whether a goal change is best suited to the child upon consideration of all the factors. Mother observes that refusing the goal change is not inconsistent with concurrent planning because, under *In re S.E.G.*, CYF can plan for termination of parental rights while pursuing the goal of reunification.

CYF and KidsVoice filed briefs in support of the Superior Court's decision, asserting that the court was not substituting its judgment regarding the credibility of witnesses but merely "highlighting" certain testimony. Brief by CYF at 14. Additionally, they contend that the Superior Court correctly interpreted the requirements of subsection (f)(9). Appellees assert

that the federal and state statutory provisions demonstrate a legislative intent that the "best interests of children in foster care specifically require that their permanency goals be changed, when a child has been in placement for 15 months, unless one of the expressed exceptions has been found." Brief by CYF at 13. Appellees focus on the public policy we asserted in *In re S.E.G.*, favoring concurrent planning to prevent prolonged foster care and foster care drift, and contend that the trial court in this case perpetuated Child's time in foster care, given that Parents are unlikely to gain reunification. They further fault the trial court for not ordering concurrent planning, when the court psychologist recommended it. Appellees request that we affirm the Superior Court's decision.[12]

■ As the Superior Court stated, the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of

12. Appellees also assert that the trial court erred in not addressing each of the factors of subsection (f) and (f.1). Initially, we note that our grant of review does not encompass that question, because we granted to determine whether the Superior Court erred and the Superior Court did not base its decision on the absence of the trial court's discussion of the other subsection (f) and (f.1) factors. Moreover, we observe that the trial court, in its opinion, implicitly addressed many of the factors of subsection (f) regarding the appropriateness and feasibility of the current placement, plan, and goal and the progress made toward that goal. *See* 42 Pa.C.S. § 6351(f)(9)(1–4). Additionally, we do not fault the trial court for not engaging in the nonsensical task of commenting on subsections (f)(7), relating to children in placement outside the Commonwealth, and (f)(8) relating to children over the age of sixteen, as no party asserts that either subsection applies even remotely to this case. We recognize that the trial court could have made specific findings regarding some of the additional subsection (f) and (f.1) factors and encourage trial courts in the future to make findings on the record regarding factors pertinent to the case being decided. We note that the practical effect of this opinion, which reinstates the trial court's order denying the goal change, and Mr. Justice Saylor's concurring and dissenting opinion, which advocates vacating the Superior Court's order and remanding to the trial court, both result in placing the case before the trial court for consideration of which placement is best suited to the Child under the current circumstances.

discretion. *In re R.J.T.*, 990 A.2d at 780 (quoting *In re D.P.*, 972 A.2d at 1225).

We do not quarrel with the trial court's observation that this case is a very close call. Without doubt, the record could have supported a goal change to adoption, as Child had been in custody for an extended period and Parents had not attained the goals of their FSP at the time of the permanency hearing. However, the record also supports the trial court's decision to deny a goal change for all the reasons stated above, including Mother and Father's continued, somewhat successful efforts to attain their goals, their positive interactions with Child, and the concerns regarding Foster Parents.

This case epitomizes why appellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court. The Superior Court in this case did just that in highlighting negative information regarding Parents. Moreover, the Superior Court did not conclude that the trial court's findings of fact were not supported by the record. Accordingly, we conclude that the Superior Court erred in reevaluating the evidence.

More significantly, the Superior Court also misconstrued the requirements of § 6351(f)(9). As noted, it interpreted the subsection to require a trial court to grant a goal change motion if a child has been in placement for fifteen of the last twenty-two months and reunification is not imminent.

The language of the statute, however, does not support such a litmus test. Instead, (f)(9) is merely one of a number of factors a trial court must consider in ultimately determining whether the current placement is appropriate or if and when another placement would be appropriate based upon the trial court's assessment of what is "best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(g). In this case, the trial court considered the various factors of § 6351(f), even if it failed to itemize its findings, and concluded that reunification remained the appropriate placement goal. The court then provided the reasons for its conclusion. As discussed above, those reasons are supported by the record developed at the permanency hearing. While the record could also have supported a decision to grant the goal change, we conclude that the trial court did not abuse its discretion in denying the goal change.

We additionally note that the trial court's decision does not prevent concurrent planning, as alleged by Appellees.[13] Indeed, the final paragraph of the trial court's opinion addressed both potential tracks: Mother and Father's ability to comply with the remaining FSP goals and the potential adoption of Child by Foster Parents. While it would have been better practice for the trial court to specify that CYF should utilize concurrent planning and include adoption as a potential alternative to reunification, the absence of specific language to that effect does not provide a basis for reversal. Nevertheless, we encourage trial courts to address the issue of concurrent planning in their orders. As we observed in *In re S.E.G.*, concurrent planning is encouraged because it both protects the child from foster care drift, by allowing agencies to consider adoptive resources (including kinship care) while

13. Notably, Appellees assert that concurrent planning "requires a goal change to adoption with ongoing services to the parents." Brief of KidsVoice at 19. Indeed, the opposite is true. As we noted in *In re S.E.G.*, "[A] construction of Section 6351(f) and (f.1) to allow agencies to file termination petitions while still providing services under a plan maintaining reunification as the child's permanency goal comports with ASFA's provision encouraging concurrent planning." *In re S.E.G.*, 901 A.2d at 1028. Concurrent planning, thus, does not require a goal change to adoption.

keeping alive the potential of reunification. *In re S.E.G.*, 901 A.2d at 1029.[14]

For the reasons stated, we hold that the Superior Court erred in concluding that the trial court abused its discretion in denying CYF's goal change motion. We reinstate the order of the trial court denying the goal change and remand to the trial court for further proceedings in this matter.

Chief Justice CASTILLE, Justices EAKIN, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Justice ORIE MELVIN files a dissenting opinion.

Justice SAYLOR concurring and dissenting.

I agree with the majority that the Superior Court erred in directing the juvenile court to change the goal to adoption. However, I also agree with the dissent that the trial court abused its discretion by failing to make statutorily-required findings. Thus, I believe that the Superior Court should have vacated the juvenile court's order and remanded the matter for reconsideration in compliance with all pertinent statutory directives.

As Madame Justice Orie Melvin correctly points out, a juvenile court must make certain findings at a permanency hearing, including whether the child has been in foster care for at least fifteen out of the last twenty-two months. *See* Dissenting Opinion at 40–42, 9 A.3d at 1197–99 (citing, *inter*

14. We observe that the Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts recently published a comprehensive benchbook for use by the bench and bar addressing issues of dependency. Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* (2010). The Benchbook recommends concurrent planning as a "best practice." *Id.* § 10.4 at 96. Additionally, the Benchbook urges courts and agencies to combine hearings for permanency plan goal change and termination of parental rights petitions because the evidence presented at both hearings overlaps substantially such that a single hearing is more efficient. *Id.* § 11.3 at 120. Moreover, a combined hearing provides for a single appeal, allowing for faster permanency for the child.

*alia,* 42 Pa.C.S. § 6351(f)); *In re J.T.,* 983 A.2d 771, 776 n. 9 (Pa.Super.2009). Indeed, Section 6351(f)(9) is one of the main statutory provisions on which Appellees argue that the Superior Court acted properly, as there is no dispute that R.J.T. was in foster care continuously for the twenty-four months leading up to the goal-change hearing. *See* Brief for R.J.T. at 11–13; Brief for Allegheny County Office of Children, Youth, & Families ("CYF") at 6–9. That subsection specifies that, upon finding that the fifteen-month prerequisite is satisfied, the court must determine "whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child...." 42 Pa.C.S. § 6351(f)(9).[1] The juvenile court, however, did not make such a determination, nor did it make other findings mandated by Section 6351(f)-such as the likely date by which the placement goal for the child might be achieved, *see id.* § 6351(f)(5)-or any of the findings required by 6351(f.1). *Cf.* Majority Opinion at 28, 9 A.3d at 1190 ("In this case, the trial court considered the various factors of § 6351(f), even if it failed to itemize its findings[.]"). It therefore appears that the Superior Court appropriately concluded that the court abused its discretion by failing to apply the law. *See In re R.J.T.,* 990 A.2d 777, 787 (Pa.Super.2010). *See generally Commonwealth v. Baird,* 601 Pa. 625, 633, 975 A.2d 1113, 1118 (2009) (observing that a trial court's failure to adhere to the law constitutes an abuse of discretion).

On the other hand, I am less certain than the dissent that the Superior Court acted properly in affirmatively directing

1. I view this language as reflecting a legislative intention to comply with Section 103 of the federal Adoption and Safe Families Act of 1997 ("ASFA"), which requires that a termination petition be filed or joined once the fifteen-month precondition occurs. *See* Pub.L. No. 105–89 § 103, 111 Stat. 2115, 2118 (1997) (current version at 42 U.S.C. § 675(5)(E) (2010)). *See generally In re S.E.G.,* 587 Pa. 568, 571, 901 A.2d 1017, 1019 (2006) ("In the years following the federal enactment of ASFA, Pennsylvania modified its statutes relating to dependent children to comport with the federal provisions."); *In re N.W.,* 859 A.2d 501, 508 (Pa.Super.2004) (recognizing a legislative intention that county agencies file an involuntary termination petition by the time the subject child has spent fifteen of the prior twenty-two months in foster care).

the juvenile court to grant the goal-change petition, rather than simply to reconsider its decision in compliance with all pertinent aspects of Section 6351. The court-appointed expert testified that concurrent planning would be appropriate, where the goal could remain reunification while CYF petitioned to terminate parental rights under the Adoption Act, *see* 23 P.S. § 2511—a practice approved by this Court in *S.E.G.* Thus, it does not appear that the underlying circumstances necessarily warranted a goal change, as the juvenile court could reasonably have accepted the expert's recommendation and denied such a change conditioned upon CYF's filing a termination petition by a date certain.[2] Ultimately, then, I believe that the appropriate action for this Court is to vacate the Superior Court's order, and remand to that court with instructions to remand the matter to the juvenile court for reconsideration in compliance with Section 6351.[3]

Accordingly, I join the majority's disposition to the extent it results in a vacatur of the Superior Court's order. However, I respectfully dissent from its conclusion that the juvenile court acted within its discretion in disposing of the agency's petition. Thus, I cannot support reinstatement of the juvenile court's order.

Justice ORIE MELVIN, dissenting.

I respectfully dissent as I cannot agree with the Majority's conclusion that the Superior Court erred in determining that

---

**2.** Although CYF acknowledges that it had a duty to file such a petition at the fifteen-month mark, *see* Brief for CYF at 9, there is no indication in the record that the agency ever sought involuntary termination.

**3.** It should be noted, however, that approximately two years have now elapsed since the January 2009 permanency hearing. Thus, reconsideration on the original record would be inappropriate, as the juvenile court's decision concerning R.J.T.'s best interests would have to account for events that have transpired during the last two years. *See generally* N.T., Jan. 23, 2009, at 34 (reflecting the court-appointed expert's view that "definitive direction" concerning R.J.T.'s permanent home should be established by July 2009); *id.* at 28 (indicating the expert's intention to conduct an interactive evaluation between the foster parents and the child); *In re R.J.T.*, No. JV–07–000237, at 5 (C.P.Allegheny, Jan. 23, 2007) (requiring a "[f]ollow up" once the expert conducts such an evaluation).

the trial court abused its discretion in denying a goal change. By way of further background, the facts reveal that nearly four-year-old male child R.J.T. was born on December 16, 2006, to Appellant R.T. ("Mother"), then age twenty, and J.T. ("Father"), then age thirty-five, who are husband and wife (collectively referred to as "Parents"). On January 23, 2007, Appellee Allegheny County Office of Children, Youth, and Families ("CYF") removed one-month-old R.J.T. from Parents' home due to domestic violence and placed him in the care of paternal grandmother ("Grandmother"). R.J.T. was adjudicated dependent on February 7, 2007. Although he initially was ordered to remain in Grandmother's care, he was placed in foster care forthwith after Grandmother permitted unauthorized visits with Father in her home, and Father absconded to Fayette County with him. Father has a long history of criminal activity and antisocial behavior, and Mother has a history of criminal activity, substance abuse, and involvement with CYF as a child and a victim. Psychological Evaluation, Dr. Neil Rosenblum, 12/18/08, at 1. The August 15, 2008 family service plan ("FSP") indicates that both Mother and Father have drug and alcohol abuse issues requiring treatment. Father was imprisoned for a variety of crimes from the time of R.J.T.'s removal in 2007 until September 2008. Parents' volatile and violent relationship has been an issue throughout R.J.T.'s young life.

On October 21, 2008, R.J.T.'s foster parents, a married couple with three biological children and two other foster children, filed a thirty-day notice for R.J.T.'s removal from their home, citing his difficult behavior, which included three-hour temper tantrums, uncertainty and fear concerning Father's then-pending prison release, and family pressure. N.T., 1/23/09, at 8, 42. The notice, however, was short-lived; within three weeks, by November 17, 2008, foster parents told Sarah Klancer, the CYF caseworker, that they wanted to withdraw the notice of removal, and they wanted to adopt R.J.T. *Id.* at 60–64.

In January 2009, CYF, joined by R.J.T.'s guardian *ad litem* ("GAL"), requested that R.J.T.'s permanency goal be changed

to adoption; Parents objected to the goal change request. At the time of the January 23, 2009 hearing, Parents remained married but lived separately. Dr. Neil Rosenblum, who conducted interactional assessments of the family, CYF caseworker Klancer, Robert Barr, a foster care worker from Bair Foundation, Mother, and Father testified at the hearing.

Although Mother was seven months pregnant with another man's child, Parents indicated they would participate in marital counseling. *Id.* at 119, 139. When asked if she wanted to reconcile with Father, Mother stated, "I want to take time, but yes." *Id.* at 121. Father, who testified that they "have issues," claimed he was willing to raise Mother's child, but also stated that he was unaware of the legal ramifications of such action. *Id.* at 138, 142. His representation of his willingness to raise the unborn child notwithstanding, Father maintained that the child's father is "supposed to take care of it. I mean, any woman or man, you know, if you're going to have a kid, you're supposed to take care of it." *Id.* at 146. Merely three months before the January 23, 2009 hearing, three days after Father was released from jail, Mother alleged Father had kidnapped and raped her, a claim she later recanted. *Id.* at 57.

Mother testified that she tries to attend weekly substance abuse meetings. Father, who was imprisoned for most of 2008, averred that he had seventy days to complete probation and had no pending charges. *Id.* at 149. Mother obtained a protection from abuse order against Father but stated that she felt pressured to pursue it. *Id.* at 120. At the time of the hearing, Father had merely two supervised visits with R.J.T. in the previous year and declined further visits claiming he could not afford to pay the court-ordered supervisor. *Id.* at 60. Mother had attended twenty-nine of forty-one visits with R.J.T. *Id.* at 70.

Dr. Rosenblum noted that Mother has "good parenting skills." *Id.* at 18. Regarding Parents' relationship, Dr. Rosenblum opined that it was "important for them just to be honest about their relationship, and if it's going to work, it's going to work. . . . [Y]es, there are risk factors, because . . .

if there is another issue of domestic violence, . . . that's going to very likely put the nail in the coffin for this. . . ." *Id.* at 18–19.

Dr. Rosenblum conducted interactional assessments of R.J.T. with Parents, but he did not assess R.J.T.'s interactions with his foster parents. The psychologist evaluated R.J.T. with Father on December 18, 2008, just one month before the hearing, performed an individual evaluation of Mother on November 17, 2008, and conducted an interactional visit between Mother and child in July 2008. *Id.* at 7–8. Dr. Rosenblum viewed foster parents' filing of the thirty-day notice requesting R.J.T.'s removal as a red flag that possibly undermined their commitment to the child. *Id.* at 9. Dr. Rosenblum stated:

Anytime that foster parents put in a 30–day notice, it does raise concerns about their commitment to a child. I do understand that it's been retracted, and I do understand that there, you know, may well have been some extenuating circumstances, but at least as an evaluator, I mean CYF may be fully satisfied with the explanation or the result, but as an evaluator, it does raise some concerns to me about their commitment to the child and, you know, since that's what you're asking me, you know, does something change my opinion.

It does change my opinion. I'd like to know why. I'd like to test the limits of their commitment to [R.J.T.] to be as confident as I could that, you know, that this is still something they want to pursue, because in all fairness, I mean, you know, the parents aren't ambivalent about their desire, birth parents to [R.J.T.], and if the Court does have to look at an alternative direction, I think we need to be confident that he's in a secure placement.

*Id.* at 9–10. Dr. Rosenblum recommended dual tracking.[1]

Clearly, Dr. Rosenblum was noncommittal whether adoption of R.J.T. should be pursued. He believed further evaluation

---

1. Dual tracking is a planning system providing child welfare services to parents to facilitate reunification, while also concurrently planning an

should occur before he could rule out reunification with Parents. He explained:

I didn't come out wholeheartedly and say reunification is viable, you know. In fact, by my suggesting concurrent planning, I'm not trying to avoid suggesting to the Court a direction, but there are some cases where there still may be further eval—further information that needs to be sorted out.

By saying concurrent planning, I know that the child has been in placement long enough to warrant the Court giving approval toward, you know, further steps toward a goal of adoption or, in other words, completing an adoptive study, things of that nature, but at the same time, I'm suggesting that parents continue to get frequent visitation and services and that I could not at this time rule out the possibility that reunification could ultimately be successful.

I think what I said in the report is that I'd like to give the—extend to the parents a little more time, *but I recognize that not only has he been in care for a long time, but I recognize that the issues which the parents are facing are serious and there is no guarantee that they're going to be able to address some of these problems because they are the result of the parents' relationship with one another and, you know, a history of domestic violence and conflict.* . . .

*Id.* at 10–12 (emphasis added). Dr. Rosenblum represented that Mother "has a history of bouncing back and forth between men and leaving dad, coming back, then leaving dad, coming back to him." *Id.* at 12–13. He noted that the "one major thing" Parents have in common is "their love of their son." *Id.* at 13.

The trial court denied CYF's goal change request to adoption, finding it would not serve R.J.T.'s best interests or best provide for his safety, protection, and physical, mental, and moral welfare. Trial Court Opinion, 4/28/09, at 1, 5. The trial court considered the foster parents' commitment to R.J.T.,

alternative permanent placement should reunification become impossible. *See In re Adoption of S.E.G.,* 587 Pa. 568, 901 A.2d 1017, 1019 (2006).

Parents' efforts toward regaining custody, and some positive interactions between R.J.T. and Parents. CYF appealed to the Superior Court.

The Superior Court reversed and remanded, holding that the trial court abused its discretion when it refused to change R.J.T.'s permanency goal from reunification to adoption pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301–6375. *In re: R.J.T.*, 990 A.2d 777 (Pa.Super.2010). The Superior Court determined that the trial court "failed to set forth the basis for its conclusion that the continuation of reunification as a permanency goal was best suited to the safety, protection and physical, mental and moral welfare of [R.J.T.]." *Id.* at 787. Specifically, relying upon this Court's pronouncement in *In re Adoption of S.E.G.*, 587 Pa. 568, 901 A.2d 1017 (2006), and the Superior Court's decision in *Interest of D.P.*, 972 A.2d 1221 (Pa.Super.2009), *appeal denied*, 601 Pa. 702, 703, 973 A.2d 1007 (Pa.2009), the Superior Court determined that the trial court abused its discretion, *inter alia*, in failing to adhere to 42 Pa.C.S. § 6351(f)(9), which requires the court to consider whether the child has been in placement for at least fifteen of the last twenty-two months, because R.J.T. had been in placement for the last twenty-four months at the time of the permanency hearing. *Id.* President Judge Ford Elliott filed a dissenting statement in which she noted that she would affirm the trial court's decision "to allow the parents 'one more chance' with continuing services provided by CYF." *Id.* at 788 (Ford Elliott, P.J., dissenting).

We granted Mother's petition for allowance of appeal on June 16, 2010, and designated the issue on appeal as follows: "Whether the Superior Court erred in determining the trial court abused its discretion in denying CYF's permanency goal change request from reunification to adoption."

Permanency hearings are "for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child may be achieved and whether placement continues to be best suited for the safety, protection and physical and mental and moral welfare of the child." *In re Adoption of S.E.G.*, 587 Pa. 568, 901 A.2d

1017, 1027 (2006) (citing 42 Pa.C.S. § 6351(e)(1)). Accordingly, the child's best interests, and not the parents' rights, must guide the court's reasoning. *In re A.K.,* 906 A.2d 596 (Pa.Super.2006).

As this Court noted in *S.E.G.,* the Juvenile Act was amended in 1998 to conform to the federal Adoption and Safe Families Act of 1997, Pub.L. 105–89 ("ASFA"), 42 Pa.C.S. §§ 6301–65. The policy underlying these statutes is to prevent children from languishing in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Furthermore, the 1998 amendments to the Juvenile Act place the focus of dependency proceedings on the child. Safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents. The legislative history of ASFA reveals that the legislation was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families. *See In re J.I.R.,* 808 A.2d 934, 939 n. 5 (Pa.Super.2002) (examining House Report No. 105–77, April 28, 1997, Cong. Record Vol. 143 (1997), "Purpose and Scope," Page 8).

> The Adoption and Safe Families Act of 1997 ... was enacted to promote the adoption of children who have been placed in foster care, to ensure their health and safety, and to encourage permanent living arrangements for such children as early as possible. In order to receive federal funds, states are required under ASFA to implement plans which, among other things, limit the obligation to provide reasonable efforts to reunify parents with children in foster care, require permanency hearings within 12 months after a child enters foster care, and require the state to file or join a petition to terminate parental rights, subject to certain exceptions, when a child has been in foster care for 15 of the most recent 22 months or when a parent has committed certain serious crimes.

Kurtis A. Kemper, "Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes," 10 A.L.R.6th 173.

In practical terms, the Superior Court has interpreted the Juvenile Act as follows:

> Pennsylvania . . . [is] required to return the child to [his or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by . . . reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. . . . [W]hen a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require [the child welfare agency] and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. *It is contemplated [that] this process realistically should be completed within 18 months.*

*In re G.P.-R.*, 851 A.2d 967, 975–76 (Pa.Super.2004)(quoting *In re B.L.L.*, 787 A.2d 1007, 1016 (Pa.Super.2001) (emphasis added)). While this period may seem short in some circumstances, it is based on the policy that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super.2003).

While the legislature has directed interpretation of the Juvenile Act to effectuate the purpose of preserving family unity when possible, it also compels provision of "another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S. § 6301(b)(1). Thus, we must give deference to the laudatory goal of preservation of the family; we are required to do so by the Juvenile Act as it is one of its stated purposes. Deference, however, "should not become rigid adherence to the principle regardless of the circumstances." *In re J.S.W.*, 438 Pa.Super. 46, 651 A.2d 167, 170 (1994). If the best interests of the child so dictate, a goal change from reunification to adoption must occur so that the agency can move forward aggressively and without impediment to secure permanency and stability for the minor child

before childhood slips away. Section 6351(f) provides the backdrop by which the Juvenile Court evaluates each particular case. *See* Majority Opinion at 19–20 n. 8, 9 A.3d at 1185 n. 8.

I respectfully disagree with the Majority's suggestion that the Superior Court's conclusion that the trial court failed to offer an arguably sufficient basis for its ruling is foundationally unsound. In support of this claim, the Majority references its prior summary of the trial court's opinion. *See* Majority Opinion at 23, 9 A.3d at 1187 (referencing 16–19, 9 A.3d at 1183–85). For example, the Majority favorably cites the trial court's representation that the law requires that "when the parents of a dependent have cooperated with the child welfare agency, achieved the goals of their permanency plans and alleviated the circumstances that necessitated the child's original placement, the agency should continue to put forth efforts to reunite the child with his parents." Majority Opinion at 17, 9 A.3d at 1184 (quoting Trial Court Opinion, 4/28/09, at 5). While an accurate statement of the law, its premise herein has not been met. In actuality, the record reflects that Parents have only minimally cooperated with CYF, they have *not* achieved the goals of their permanency plans, and they have *not* alleviated the circumstances that necessitated R.J.T.'s original placement four years ago.

The Majority also refers to the trial court's reliance on Dr. Rosenblum's concern regarding the foster parents' commitment to R.J.T. The Majority highlights the trial court's assessment that foster parents' extended family "does not have a close relationship with [R.J.T.] or see him as part of the family...." Majority Opinion 17–18, 9 A.3d at 1184 (citing Trial Court Opinion, 4/28/09, at 5). These representations do not withstand scrutiny in the record and merely are musings by the trial court. The only related matter that does find support in the record is that foster parents filed a thirty-day notice to remove R.J.T. from their home but quickly withdrew it. While Dr. Rosenblum brought to light that foster parents' commitment to R.J.T. **may** be viewed as less than resolute in view of their now-withdrawn thirty-day notice to remove the child, the fact remains that they did withdraw their objection,

and the record testimony from the CYF caseworker was that they desired to adopt R.J.T.  N.T., 1/23/09, at 61.

Moreover, I disagree that "the Superior Court emphasized the language of 42 Pa.C.S. § 6351(f)(9)" merely to support its conclusion that the provision required the trial court to change the goal to adoption.  Majority Opinion at 24, 9 A.3d at 1188. The Superior Court laudably referenced the relevant statutory provision *because the trial court ignored it completely.*  Nowhere in its opinion did the trial court either acknowledge its duty pursuant to 42 Pa.C.S. § 6351(f) ("At each permanency hearing, a court *shall* determine all of the following . . .") nor did it explain its evaluation of the considerations enumerated therein.  The Superior Court was responsible for ensuring that the record represented a comprehensive inquiry, and that the trial court applied appropriate legal principles.  I further cannot agree that our grant of review in this case "does not encompass [the] question [of whether the trial court addressed the § 6351(f) and (f.1) factors], because . . . the Superior Court did not base its decision on the absence of the trial court's discussion of [those] factors."  Majority Opinion at 26 n. 12, 9 A.3d at 1189 n. 12.  The Superior Court specifically held, "After a careful review of the record in the instant appeal, *we conclude that the trial court failed to follow the legal principles set forth in § 6351(f) and (f.1),* and in particular subsection (f)(9)."  *Interest of R.J.T.,* 990 A.2d at 787 (emphasis added) The Superior Court could not have been more clear that its decision to reverse was based on the trial court's failure to follow the principles set forth in § 6351(f). It was incumbent upon the trial court to evaluate the § 6351(f) provisions, and the Superior Court recognized that shortcoming.  In my view, any review of the Superior Court's decision must encompass that representation.

I also cannot agree that the Superior Court concluded based *solely* on § 6351(f)(9) that the trial court abused it discretion in refusing to change the permanency goal to adoption.  The Superior Court examined *all* of the pertinent § 6351(f) factors, but emphasized (f)(9).[2]  Indeed, the Superior Court stated,

2.  In my view, the key aspects of § 6351(f)(9), broken down to its elements, are as follows: **If** the child has been in placement for fifteen

"After [R.J.T.] had been removed and placed in care for 15 of the preceding 22 months *and the parents were not ready for reunification,* the trial court committed an abuse of discretion in refusing to change the goal from reunification to adoption...." *Interest of R.J.T.,* 990 A.2d at 788 (emphasis added). The Superior Court's conclusion that Parents were not ready for reunification could only have evolved from its evaluation of the other § 6351(f) factors. While the trial court indicated it was a very "close call," and utilized its discretion to give Parents yet *another* chance to fully achieve their FSP goals, the trial court did not analyze the factors enumerated in 42 Pa.C.S. § 6351(f), as it was obliged to do, and the Superior Court rightly concluded that this omission constituted an abuse of discretion.

In my view and the view of the GAL, KidsVoice, the trial court's refusal to order concurrent planning was unreasonable.[3] CYF, the GAL, and the court-appointed special advocate ("CASA") all recommended that the trial court change the goal to adoption. Dr. Rosenblum, who did not want CYF to cease reunification efforts, recommended that the trial court engage in concurrent planning. In such a scenario, ongoing services are continued to Parents, while the court concurrently

of twenty-two months, **or** Aggravated circumstances exist **and** reasonable efforts to prevent removal need not be made or continued, **then** the juvenile court must determine whether the agency has filed or joined in a termination of parental rights petition **and** identified a qualified family to adopt the child, **unless** the child is with a relative, the agency has a compelling reason why a termination of parental rights petition would not serve the child's needs and welfare, **or** the family has not been given the necessary services. In other words, after fifteen of twenty-two months, if there is no compelling reason not to file a petition to terminate parental rights, the agency should move forward to remove the child from indefinite foster care.

3. I also disagree with the Majority's suggestion that "[a]lthough the [trial] court did not use the term 'concurrent planning' in the phrasing of its conclusion, [its] final two sentences address the consideration of two tracks for [R.J.T.]," Majority Opinion at 18, 9 A.3d at 1184. I believe we must evaluate the lower courts' actions based on what trial judges say, not on what they imply, and the trial court never used the term concurrent planning. The final two sentences referenced above are equally consistent with mere reluctance by the trial court to change the goal to adoption in order to allow Parents "more time" to achieve the FSP goals that should have already been met.

plans an alternative permanent placement. Such planning allows the court to test the foster parents' commitment to the child and Parents' stated commitment to achieving the FSP goals, while still ensuring that the goals of ASFA and the Juvenile Act relating to permanency for children are not ignored.

I wholeheartedly agree with the Majority's observation that "we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness," nor can we "reweigh the evidence." Majority Opinion at 27, 9 A.3d at 1190. This laudable and practical admonition, however, does not allow us to overlook a trial court's failure to consider relevant statutory considerations. This trial court failed to evaluate the pertinent considerations set forth in § 6351(f), including (f)(9), and the Superior Court correctly determined that such failure was an abuse of discretion.

My review of the record compels the conclusion that R.J.T. deserves to have permanency in his life, in time to allow him to bond with his adoptive parents while he is still young enough to do so. He was removed from Parents when he was only one month old. He is now almost four *years* old. The trial court's order did not specifically direct concurrent planning nor determine a date by which the goal of permanency for the child may be achieved. Consequently, R.J.T. will continue to languish in foster care. I believe the Superior Court's order reversing and remanding for the entry of an order changing the goal to adoption should stand.