J-S61002-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: E.C.K., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: E.N.K., FATHER : No. 766 MDA 2015


Appeal from the Order Entered April 2, 2015,
in the Court of Common Pleas of Centre County,
Juvenile Division, at No(s): CP-14-DP-0000046-2012

BEFORE: PANELLA, WECHT, and STRASSBURGER,* JJ.

DISSENTING MEMORANDUM BY STRASSBURGER, J.:

**FILED NOVEMBER 24, 2015**

Father appeals from the trial court's April 2, 2015 order changing Child's permanent placement goal from "return home" to "planned permanent living arrangement/ long-term foster care" with a concurrent goal of adoption. Our Supreme Court has emphasized the importance of concurrent planning and dual tracking in dependency cases, stating

> concurrent planning involves a dual-track system by which agencies are encouraged to provide simultaneous services aimed at both reunification and adoption. In ***In re S.E.G.,***[901 A.2d 1017 (Pa. 2006),] we observed that concurrent planning developed to address the problem of foster care drift, where children languished in the foster care system while their parents unsuccessfully attempted to regain custody. Rather than waiting to pursue adoption options until all reunification attempts fail, concurrent planning allows children to move more quickly through the dependency system and into the permanent placement best suited to their individual situation through simultaneous pursuit of reunification and alternative permanent placement.

***In re R.J.T.***, 9 A.3d 1179, 1186 (Pa. 2010).


*Retired Senior Judge assigned to the Superior Court.

In its order, the trial court noted that Father has minimally complied with the permanency plan because he "has had only one visit with [Child] since May of 2014." Order, 4/2/2015, at 1. However, as outlined more extensively below, the record reveals that Father, due largely to his decision to reside outside of Centre County, was not receiving services to assist in any eventual reunification with Child. Thus, on appeal, Father argues that there was insufficient evidence presented at the final permanency hearing to support the goal change to adoption. Because I agree the record support's Father's contention, I respectfully dissent.

Additionally, I am troubled by the trial court's failure to address in its 1925(a) opinion the factors to be determined at a permanency hearing set forth 42 Pa.C.S. § 6351(f). Our Supreme Court has highlighted on numerous occasions the importance of these factors. **See e.g. In re R.J.T., supra**. This omission substantially hampers our review of the case particularly where, as here, the record reveals that Father's progress toward reunification with Child has suffered from circumstances outside of his control.

The record reveals the following. Mother and Father are a divorced couple and the biological parents of Child, born in January of 2009. At the time of Child's birth, the family lived in Centre County, Pennsylvania. Centre County Children and Youth Services (CYS) has been involved with the family since January of 2010. Dependency Petition, 12/20/2012, at 3. At some

point, Father left Mother and moved to Adams County. Child remained in the care of Mother in Centre County. While living in Adams County, Father was exercising his right to partial custody. N.T, 4/2/2015, at 109-10. While Father was residing in Adams County, Centre County CYS recommended that Child participate in the Head Start program, effectively limiting Father's custodial time with Child to weekends. N.T., 1/8/2013, at 17-19. A Centre County CYS visit of Father's home at the time of the change in partial custody indicated that the home was not appropriate and, because Father was residing in Adams County, the matter was referred to Adams County CYS. *Id.* at 17-19. At some point, Adams County CYS closed its case after repeated unsuccessful attempts to contact Father. *Id.*

On December 18, 2012, Father contacted Centre County CYS to inform them that he had moved to York County and wished to have his home evaluated to determine if it was appropriate for custody. *Id.* at 7-8. The request was passed to York County CYS and, at the time of the January 8, 2013 hearing, the trial court was awaiting York's report regarding the acceptability of the York residence before it would consider reinstating Father's visitation rights. *Id.* at 8. On January 8, 2013, Child was adjudicated dependent, but was returned to the custody of her mother. *Id.* at 16.

At some point between January of 2013 and May of 2014, Father relocated to North Carolina. During this time, Child continued to reside with

Mother in Centre County, where Mother was receiving services. N.T., 5/2/2014, at 3. Father was not made aware of the May 2, 2014, emergency shelter hearing. *Id.* at 4. At that hearing, a representative from Centre County CYS indicated that Father was in York County, but mail sent to his address was returned. *Id.* At the conclusion of the hearing, Child was placed in foster care due to Mother's admission into inpatient rehabilitation for mental health treatment.

Father was notified of the May 13, 2014 review hearing and testified that he was living in North Carolina, working as a roofer. N.T., 5/13/2014, at 38. He testified that before moving to North Carolina in late April of 2014, he had been living at the same address in York, which had been approved by Centre County CYS. *Id.* at 38-39. However, no visitations with Child had occurred. *Id.* The trial court indicated that Father could not be considered as a viable "placement resource" because he had not completed "all the things" he needed to do in order to obtain CYS approval. *Id.* at 40. Father was advised by CYS to maintain a stable residence and employment, and have contact with Child. *Id.* at 41.

Before the October 13, 2014 review hearing, Father's vehicle broke down on his trip from North Carolina to Pennsylvania, but he was able to participate via telephone. N.T., 10/13/2014, at 35. At that hearing, a representative from Centre County Family Intervention Crisis Services (FICS) testified that Mother was informed in September of 2014 that Father

was being considered as a permanency source and, a month later, on October 9, 2014, Mother sent a document to Centre County CYS alleging that Father was abusing Child. *Id.* at 16-17, 20. The investigation into these allegations suspended Father's visits. FICS also indicated that, because it was directed to commence reunification with Mother, it did not have any contact with Father. *Id.* at 14.

The CYS caseworker testified that Father was informed that he needed to meet with Pamela McCloskey, M.Ed., a licensed psychiatrist, for an assessment to determine whether "it was appropriate for him to have visitation, if he knew how to speak to his daughter." *Id.* at 21. Father explained the situation regarding this appointment as follows.

> The first [appointment with Ms. McCloskey, scheduled for August of 2014], that was canceled because of me not calling. I was not informed that there was an after hours number until after my appointment was canceled. … And then the following [appointment] was this past Saturday, which on Thursday is when I got the phone call saying that my [appointment] was canceled due to [Mother's] allegations.

*Id.* at 34.

The testimony from the April 2, 2015 review hearing further expounded on the circumstances regarding Father's attempts at compliance with CYS's directives. The arrangements for the August appointment with Ms. McCloskey involved transporting Child two hours for a visit with Father following the appointment. N.T., 4/2/2015, at 36. Father contacted Ms. McCloskey's office the Wednesday before the appointment to confirm, but

was told that he would have to call the office on Friday, the day before the Saturday appointment. *Id.* at 37. Father did not contact the office on Friday because he was traveling to Pennsylvania, a situation he had explained to office staff. *Id.* Nonetheless, as a result of his failure to call on Friday, the appointment and visit were canceled. *Id.* at 38. Father was not informed of this turn of events until he arrived at McCloskey's office.

Father was eventually able to meet with Ms. McCloskey and scheduled a visitation with Child, which was confirmed by letter from Father's counsel to the CYS caseworker on August 28, 2014. *Id.* at 64. In that letter, counsel requested that CYS make a determination that his new home in North Carolina was appropriate. *Id.* CYS never followed up on this because Father was told in the past that he would have to make short, consistent visits with Child to reestablish a relationship prior to any home study. *Id.* at 66-67. Father was permitted to call his daughter weekly, which he did on Saturdays at 6:30 pm. *Id.* at 108.

However, the investigation into Mother's October 2014 allegations against Father suspended his visits and phone calls until December 20, 2014. *Id.* at 53. CYS testified that the December 20, 2014 visit between Father and Child was "terrible"; Child did not want to attend and spent the two-hour car ride screaming and crying. *Id.* at 54-55. The visit was delayed by about 45 minutes due to Child's refusal to attend. *Id.* Once at Ms.

McCloskey's office, Child initially stated that she didn't want to see Father, but eventually warmed to him and they engaged appropriately. *Id.* at 56-58.

On January 5, 2015, Father called to cancel due to weather what he thought was a scheduled visitation, only to find out that CYS had not scheduled the visit. *Id.* at 108, 117. On January 19, 2015, Father's counsel sent a letter to CYS requesting additional visitations with Child. *Id.* at 68. At that point, counsel was informed that no further visitations would occur. *Id.* at 68-69.

Father testified that he and his family had relocated to Bellefonte, Centre County from North Carolina a week and a half before the hearing, for the express purpose of seeking custody of Child. *Id.* at 102. Father stated that he was able to return to the roofing job he had left before relocation to North Carolina, but because of the weather he was working only 30 hours a week, although he expected work to pick up once the weather turned. *Id.* at 113. His fiancés' children were enrolled in cyber school, and his fiancé was planning to work at a restaurant once the children were settled. *Id.* at 114. Father testified that, since his return to Pennsylvania he had notified Centre County's domestic relations office of his relocation and he was awaiting transfer of his paperwork from North Carolina. *Id.* at 118-119.

On appeal, the *guardian ad litem* contends, and the trial court agrees, that the planned permanent living arrangement or long-term foster care with concurrent adoption goal must stand because Father "has a well-

documented history of failing to follow through with court and agency directives as to what he needed to do to obtain custody" of Child. *Guardian Ad Litem* Brief at 1. However, that allegation is not supported by the record. Father, by virtue of living outside of Centre County, has had the deck stacked against him from the start. As outlined above, Father never received services from CYS or FICS. In fact, FICS was told not to deal with Father because Mother had been identified as an option for reunification. When Father finally began to make progress, his efforts were erased by CYS's investigation into Mother's unfounded abuse allegations. The December 20, 2014 visit, while certainly not ideal, ended well by the admission of all involved. Despite this, and despite counsel's attempt to contact CYS, no further visits were scheduled and the placement goal was changed from to "planned permanent living arrangement/ long-term foster care" with a concurrent goal of adoption.

As counsel points out,

> It has been concluded that when the [c]ourt allows the appropriate Children & Youth Services agency to change the goal for a child from Return Home to Adoption (keeping in mind that in the present case, there is an interim goal of Planned Permanent Living Arrangement/Long-Term Foster Care with the ultimate goal of adoption), the [c]ourt by its decision has decided that the agency has provided adequate services to the parent in question and that parent is incapable of caring for the minor child despite the services provided. As was previously pointed out several times, no services have ever been provided to Natural Father in this case. Children & Youth Services has never determined that any home in which Natural Father has lived is inappropriate for the minor child.

> Without providing services to Natural Father, the continuing necessity for placement, the first prong of the factors to consider, cannot be answered.

Father's Brief at 22 (citations omitted). The record before us does not demonstrate that Father is uninterested in or incapable of parenting Child. Rather, the record demonstrates that Mother was identified as the parent in need of support to the exclusion of Father, calling into question the trial court's determination that a change of goal with respect to Father was appropriate.

Accordingly, because I believe the trial court abused its discretion, I respectfully dissent.