J-S28001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.S., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 805 EDA 2021 |

Appeal from the Order Entered April 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000545-2020

BEFORE:   BOWES, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                          **FILED NOVEMBER 2, 2021**

W.S., a dependent child born in August 2010, through his legal counsel, Michael Angelotti, Esquire, appeals from the April 13, 2021 dispositional order, which directed that he remain placed in foster care.[1]  We affirm.

Prior to the incident that is the genesis of his adjudication of dependency, W.S. resided in Philadelphia with F.T. ("Mother"), W.J.S. ("Father"), and V.S., a sister born in October 2012, who was also adjudicated

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The juvenile court appointed both legal counsel and a separate guardian *ad litem,* Susan Rubinovitz, Esq*.,* to represent W.S.'s conflicting interests during the dispositional hearing.  The guardian *ad litem* argued in favor of foster care during the juvenile court proceedings, however, she neglected to file a brief with this Court.

dependent.[2]  Only W.S. is the subject of this appeal, and only W.S. filed an appeal from the April 13, 2021, order.

The record reveals that the Philadelphia Department of Human Services ("DHS") became involved with W.S. on May 16, 2020, when Philadelphia police officer Colleen McLain responded to a person screaming inside the family's home, which was a known "chronic problem house."  N.T., 12/2/20, at 20-21, 24.  Outside of the residence, Officer McLain encountered Mother, who was screaming and acting erratically, and had "wet marks on her pants."  *Id*. at 21.  Mother initially explained that she had urinated on herself, then indicated that she was pregnant, and that Father kicked her in the stomach.  *Id*. at 21, 24.  Officer McLain requested an ambulance for Mother, but Mother refused treatment and departed.  *Id*. at 21, 29.

Officer McClain looked inside the home and observed that "[t]here was not a square inch of floor to walk on in the living room.  There was everything from . . . kitchen ladles, tools -- everything and anything you could possibly think of wound up on the living room floor."  *Id*. at 29-30.  The officer noted that one of the windows was broken, and that W.S. was barefoot and walking through the broken glass.  *Id*. at 21-22.  W.S. informed Officer McClain that Mother was "just crazy and she does this all the time."  *Id*. at 22.  Officer

---

[2] Although the facts and procedural history of V.S.'s dependency case mirror that of W.S., she did not appeal the dispositional order placing her in foster care.

McClain alerted DHS and spoke to Father regarding the poor conditions in the home, which prompted Father to take W.S. to stay with a family member. *Id*. at 35-36, 107-08.

Two days later, Gabriel Li, a DHS social worker, visited the family's home. *Id*. at 112. When Mr. Li arrived, he observed significant damage to the home, which included broken windows and "fist-sized holes in the walls." *Id*. at 119-20. Father denied that domestic violence had occurred and stated his children damaged the home while roughhousing. *Id*. In addition, Mr. Li "smelled and observed active sewage issues in the basement," and "that someone had etched the word [`]rape[`] . . . and, 'No means no,' on multiple locations in the home. *Id*. at 120. When Mr. Li met with W.S., the child appeared "extremely dirty," and his answers to questions were evasive and guarded. *Id*. at 121. Mr. Li suspected that W.S. had been "coached." *Id*. at 121, 131.[3]

As a result of its investigation, DHS obtained protective custody of W.S. by verbal order on May 18, 2020. DHS then filed an application for emergency protective custody on May 19, 2020, which the juvenile court granted on May 20, 2020. The same day, a juvenile court hearing officer conducted a shelter

---

[3] During the DHS investigation, Mother's whereabout were unknown. N.T., 12/2/20, at 140. DHS subsequently discovered that, in August 2020, Mother gave birth to W.S.'s brother, L.T., in New Jersey. *Id*. at 141. DHS referred the matter to New Jersey child protective services, who has retained custody of L.T. *Id*. at 142; N.T., 1/21/21, at 22.

care hearing and recommended that W.S. remain placed in foster care. The juvenile court adopted the recommendation and immediately entered it as an order.

Thereafter, DHS filed a dependency petition, and the juvenile court held adjudicatory hearings on December 2, 2020, January 21, 2021, and March 11, 2021. DHS presented the testimony of Officer McLain, Mr. Li; and Jaime Weintraub, the Community Umbrella Agency ("CUA") case manager, and later case manager supervisor. Father testified on his own behalf. On March 11, 2021, the juvenile court adjudicated W.S. dependent and scheduled a dispositional hearing for April 13, 2021.

During the dispositional hearing, the court heard the additional testimony of Leira Morciglio, a CUA case manager, Father, and Mother. Following the hearing, the court entered a "permanency review order," directing that W.S. remain in foster care with a permanent placement goal of return to parent or guardian.[4] W.S. timely filed a notice of appeal along with a concise statement of errors complained of on appeal.

On appeal, W.S. raises the following claim for our review: "Whether the [juvenile] court erred as a matter of law or abused its discretion in finding that

_____

[4] Although the juvenile court entitled the order a "permanency review order," it is evident from the court's statements that it intended the order to serve as its final order of disposition. *See*, *e.g.*, N.T., 4/13/21, at 121 ("All right, so with respect to this case, my dispositional order is as follows."). The court entered an amended version of the order on May 21, 2021, to which it added the exhibits entered into evidence.

[DHS] met its burden to prove that it was clearly necessary to remove W.S. from his home[?]" W.S.'s brief at 3.

We review orders in dependency proceedings pursuant to an abuse of discretion standard of review. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We must accept the juvenile court's credibility determinations and findings of fact and when the record supports them, but we need not accept the court's inferences or conclusions of law. *Id*.

The Juvenile Act governs dependency proceedings. *See* 42 Pa.C.S. §§ 6301–6375. The Juvenile Act provides that a juvenile court may adjudicate a child dependent if it determines he or she meets the requirements of one of ten definitions listed at 42 Pa.C.S. § 6302. Here, the court adjudicated W.S. dependent under the first of these definitions, which describes a dependent child as lacking "proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302(1).

If a juvenile court determines a child is dependent, it must then enter an appropriate dispositional order. 42 Pa.C.S. § 6341(c), 6351(a); Pa.R.J.C.P. 1409(A)(1), 1509(D), 1515. The Juvenile Act and our Rules of Juvenile Court Procedure provide a that court may remove a child from a parent's home if it finds remaining in the home would be contrary to the child's "welfare, safety or health[.]" 42 Pa.C.S. § 6351(b)(1); Pa.R.J.C.P. 1514(A)(1). In addition, our case law instructs that a court may remove a child from a parent's home

"only upon a showing that removal is clearly necessary for the child's well-being. . . . [C]lear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with [his or] her family are unfeasible." *In re A.B.*, 63 A.3d 345, 349-50 (Pa.Super. 2013) (quoting *In the Interest of K.B.*, 419 A.2d 508, 515 (Pa.Super. 1980)).

W.S. does not challenge his adjudication of dependency but argues that the juvenile court should have returned him to Father with supervision rather than continue his placement in foster care. W.S. assails the court for neglecting to conduct "a cost-benefit balancing test" when deciding whether to continue his placement, and he asserts that the court failed to place adequate weight on both Father's success in remedying the causes of his removal and the harm that he is suffering by remaining in foster care. W.S.'s brief at 24-27. W.S. contends that Father repaired his home, such that the condition of the home is no longer a concern. *Id*. at 25. Similarly, he argues that Father ceased his relationship with Mother and is participating in services, such that domestic violence is no longer a concern. *Id*. at 25-27. Finally, W.S. maintains that his continuing stay in foster care is harmful to his mental health, that his behaviors have begun to deteriorate while in foster care, and that he was "doing better" when he was living with his parents. *Id*. at 24-27.

The juvenile court did not draft a written opinion explaining its decision to continue W.S.'s placement in foster care. Instead, on May 17, 2021, the

court issued a "Notice of Compliance" directing our attention to its comments on the record at the conclusion of the dispositional hearing and the notes of testimony and exhibits from the dispositional and adjudicatory hearings. In its comments on the record, the court reasoned that it was cognizant of W.S.'s desire to return home, but that an immediate return would not be in his best interest. N.T., 4/13/21, at 121. The court found W.S. had suffered emotional harm in Father's care and explained, "I am hoping . . . by the time we come back, I will have a better sense of the interaction -- primarily from dad . . . from a therapeutic perspective." *Id*. at 122. In addition, the court expressed concern that a psychological evaluation of Father[5] indicated that he exhibited "narcissistic traits," since, the court observed, children "learn more from what they see than what they're told." *Id*. at 122-23. The court concluded that W.S. could not return home "without some therapeutic interventions." *Id*. at 123.

Our review of the certified record supports the juvenile court's decision. As we detailed above, W.S. entered foster care due to an incident on May 16, 2020, and a subsequent DHS investigation. The concerns causing W.S.'s placement were the poor conditions in the family's home and domestic violence between Father and Mother. Father repaired the home after the incident on May 16, 2020, so domestic violence remained the principal barrier

---

[5] Father participated in this evaluation in connection with L.T.'s child protective services case in New Jersey. *See* Exhibit CA 3.

preventing W.S.'s return. N.T., 12/2/20, at 154, 172-74; N.T., 1/21/21, at 26-27, 35-36, 47, 68-69.

Contrary to W.S.'s assertion that Father remedied his domestic violence problems, the record reveals that Father initially denied domestic violence had ever occurred. During the adjudicatory hearing, Father stated repeatedly that he never engaged in domestic violence with Mother and offered various dubious excuses for the calls to police and damage to the family's home. N.T., 3/11/21, at 25, 39, 45, 84, 88-90, 93. Father maintained, among other things, that the word "rape" etched into the wall of the home did not refer to sexual assault but instead referred to "rapeseed . . . a really pretty yellow flower that . . . [Mother] and I wound up liking. It matched our wall originally, and we were repainting[.]" *Id*. at 27. Regarding the holes in the walls, he insisted the home was "settling," and he was "resetting the walls and getting ready to spackle and plaster. . . . what's a better time than COVID to fix your house?" *Id*. at 29.

Although Mother moved out of the home, CUA also continued to receive reports that Father was contacting Mother and engaging in domestic violence. For example, Jaime Weintraub, a CUA case manager, and later case manager supervisor, testified regarding an incident that took place at the hotel where Mother was staying in October 2020. N.T., 1/21/21, at 11. Mother informed Ms. Weintraub that Father appeared at the hotel unexpectedly and entered through the window, resulting in an "altercation." *Id*. at 12. Father then left

- 8 -

but continued to call Mother until she arrived at a police station, at which point a police officer took Mother's phone, and Father hung up. *Id*. Ms. Weintraub testified Father was later arrested at the hotel in November 2020.[6] *Id*. While Mother attempted to obtain a protective order against Father, she was unable to attend a hearing related to the order because her phone stopped working, and the case was dismissed. *Id*. at 13-14. Ms. Weintraub noted that Mother's phone was on Father's phone plan, and that Mother believed Father terminated her service. *Id*.

Father did not deny that he had been in contact with Mother but attempted to justify this contact. He explained that he visited with Mother within one week of his March 11, 2021 testimony, "going through paperwork, clothing, and figuring out what she needed and what she didn't need. . . . I believe she came here once or twice for . . . other odds and ends [and] things that she needed." *Id*. at 74-75. Father noted, "[t]here's a lot of stuff here has to be taken care of between the two of us." *Id*. at 75.

It was not until after the juvenile court adjudicated W.S. dependent that Father acknowledged domestic violence was problem, that he should attend domestic violence treatment, and that he should avoid contact with Mother. CUA case manager, Leira Morciglio, testified that Father called her on March

_____

[6] Father testified that he was convicted of "petty harassment" in connection with the New Jersey incident and was sentenced to probation. N.T., 3/11/21, at 46-47, 79-80.

12, 2021, admitted that there was "some domestic violence" between him and Mother, and that he was both a perpetrator and a victim of the violence. N.T., 4/13/21, at 20-21. Ms. Morciglio testified that Father enrolled in a program for domestic violence perpetrators, completed the intake process, and had his first session scheduled for April 15, 2021. *Id*. Father also received referrals for a domestic violence program for victims but was waiting for an available provider. *Id*. at 27, 54. At the conclusion of the April 13, 2021 dispositional hearing, Mother asked that the juvenile court enter a "stay away order" against Father, and counsel for Father indicated that he "doesn't want to have any contact with her either[.]" *Id*. at 100. As a result, the court added a provision to the order on appeal prohibiting the parents from having contact with each other. *See* Permanency Review Order, 4/13/21, at 2 ("Court issues a stay away order against [F]ather as to [M]other, and against [M]other as to [F]ather.").

Thus, while W.S. is correct in stating that Father now admits the existence of domestic violence between him and Mother, and the juvenile court's order now prohibits Father and Mother from having contact, W.S. fails to acknowledge the recency of these developments. Revealingly, Father denied the existence of domestic violence prior to W.S.'s adjudication of dependency and had not yet begun domestic violence treatment sessions at the time of the dispositional hearing. In addition, while Father now admits to domestic violence, he continues to accept only limited responsibility for his

behavior.  For example, even at the dispositional hearing, Father continued to challenge the evidence supporting W.S.'s prior adjudication of dependency by presenting photographs in a bid to discredit Officer McClain's testimony regarding the squalid state of the home.  Father testified, "The reason I took the photograph was to show that you cannot see into my house by standing in the doorway."  *See id*. at 88-89.

When rendering the dispositional order in this matter, the juvenile court was tasked with reconciling Father's recent admission to domestic violence, alleged willingness to attend treatment, and new-found desire to avoid contact with Mother, with Father's prior duplicity regarding the continued presence domestic violence after W.S. entered foster care and the harm that W.S. might suffer if he returned to Father's care too early.  In this circumstance, it is well within the juvenile court's discretion to conclude that it is clearly necessary to remove W.S. from the home until adequate safeguards are in place and any prior trauma to W.S. was addressed appropriately.  Accordingly, we discern no abuse of discretion, and we affirm the court's April 13, 2021, order.

Order affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/02/2021