J-A20033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF A.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 904 EDA 2022 |

Appeal from the Order Entered February 28, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001137-2020

BEFORE:  STABILE, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED SEPTEMBER 08, 2022**

T.B. (Mother) appeals an order of the Court of Common Pleas of Philadelphia County Juvenile Division (trial court) adjudicating her biological child A.M. (Child) dependent due to child abuse perpetrated by Mother.[1] Although Mother does not dispute the finding of dependency, she does challenge the finding of child abuse in two respects.  She contends that the trial court committed an error of law and abused its discretion in discounting Mother's evidence that no child abuse had occurred and in separately finding that Mother was the perpetrator of the abuse.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court had also found that K.M. (Father) had perpetrated child abuse, but Father is not a party to this appeal, and the trial court's findings relating to Father are not now at issue.

**I.**

A.M. was born in August 2020.[2]  Mother and Father have been the primary caregivers since Child's birth.  According to Mother and Father, they began noticing on September 7, 2020, that Child was having difficulty eating and she had also been vomiting.  Additionally, Child had been screaming for several days due to discomfort from an unknown cause.  Both that day and the following day, Mother took Child to Holy Redeemer Hospital to be evaluated.  Each time, according to Mother and Father, Child was discharged once she was able to successfully breastfeed.  On the morning or afternoon of September 9, 2020, Mother took Child to a pediatrician to determine whether an injury was causing the child discomfort, but again, according to Mother and Father, no such trauma was identified at that point.[3]

Later, on September 9, 2020, at about 7:00 p.m., Mother left Child with her maternal aunt.  Father then picked Child up that evening between 8 p.m. and 9:30 p.m. and took Child to his house.  When Father attempted to put Child to bed, he noticed that her pacifier had fallen out of her mouth, her left arm was stiff and her eyes were droopy.  Child seemed to be unresponsive

---

[2] The following facts are gleaned from the certified record and the findings of the trial court which were outlined in its opinion.  **See** Trial Court Opinion, 4/22/2022, at 1-14.

[3] None of physicians who treated A.M. on September 8 and 9, 2020, testified at the subject hearings, and the information given by Mother and Father as to what happened on those dates was not corroborated by any other sources.

and at about midnight, after consulting with other relatives, Father took Child to the Nazareth Hospital Emergency Department.

Treating physicians noted that Child was having seizures and breathing difficulties. She was diagnosed with brain hemorrhages and given medication. She was also intubated and placed on a ventilator. On September 10, 2020, Child was transferred to the intensive care unit of the Children's Hospital of Philadelphia (CHOP).

When admitted to CHOP, Child was nonresponsive and it was found that her breathing tube had become clogged. Child then had to be resuscitated. She was soon diagnosed with seizures stemming from multiple hemorrhages in and around her brain and eyes. The treating physicians had classified Child's case as a "near fatality" because she had required life-saving medical intervention. *See* Trial Court Opinion, 4/22/2022, at 20.

The Philadelphia Department of Human Services (DHS) received reports from Child Protective Services (CPS) on September 10, 2020, describing Child's physical condition. CPS expressed concern that Child had suffered from non-accidental trauma due to the acute nature of the injuries and the fact that Child's parents could not explain how the injuries had been sustained.

The trial court held hearings on August 31, 2021, December 1, 2021, February 8, 2022, and February 28, 2022, to determine if Child was indeed the victim of child abuse and whether she should be adjudicated dependent. DHS called one of Child's treating physicians, Dr. Colleen Bennett, as an expert

witness on the subject of child abuse pediatrics. According to Dr. Bennett, Child was diagnosed with numerous and severe hemorrhages around her brain, as well as multiple retinal hemorrhages around both eyes. *See* Hearing Transcript, 8/31/2021, at pp. 29-32. In Dr. Bennett's opinion, the most common cause of such hemorrhages in children of Child's age is trauma. *Id*. at pp. 34-36. Dr. Bennett testified further that Child was incapable of causing these injuries herself, and that the severity of Child's injuries was consistent with child abuse and inconsistent with accidental trauma. CHOP had used a number of tests to rule out other causes of Child's injuries, such as cancer, infection, a bleeding disorder and a metabolic disorder. *Id*. at pp. 36-37.

Dr. Bennett testified that Child's discomfort and eating difficulty in the days prior to her hospitalization could have been related to the seizure and the hemorrhages, but that she could not determine this with a reasonable degree of medical certainty. However, the extent of the bleeding in and around the hemorrhages, as well as the acute nature of Child's injuries, demonstrated to Dr. Bennett to a reasonable degree of medical certainty that the injuries had occurred within "days to a week" of Child's hospitalization, and that Child's condition was caused by non-accidental trauma and child abuse. *Id*. at pp. 62-63. Dr. Bennett testified that it was impossible to pinpoint a more specific time in which Child had sustained the acute injuries causing the hemorrhages.

Mother's rebuttal evidence came in the form of her own testimony and the testimony of Dr. Joseph Scheller, a pediatric neurologist who was qualified by the trial as expert. *See* Hearing Transcript, 12/1/2021, at 14. Unlike Dr. Bennett, it was Dr. Scheller's opinion that Child's injuries could have been the result of complications from birth-related trauma rather than recent acute trauma inflicted by child abuse. *Id*. at p. 50. Dr. Scheller testified that if Child had partially-healed brain bleeds from the birth process, they could have been accidentally reopened, causing the current symptoms Child presented with. Moreover, Dr. Scheller opined that Child's brain injuries could not be accurately dated, and that it could not be determined whether they had resulted from recently inflicted or non-accidental trauma. *Id*. at pp. 61-62.

After hearing argument, the trial court ruled that DHS had met its burden of presenting clear and convincing evidence that Child was dependent, and that Child was a victim of non-accidental trauma, warranting findings of child abuse against Mother and Father. The trial court explained that Child was in the "primary care and control of Mother and Father during the time the injuries were discovered" and that "[n]o evidence was presented to refute that Mother and Father were Child's primary caretakers when she sustained these near-fatal injuries." Trial Court Opinion, 4/22/2022, at 21.

With respect to the nature of Child's physical condition, the trial court found Dr. Bennett's testimony more "credible and compelling" than Dr. Scheller's. *Id*. at 18. Significantly, the trial court also stressed that neither

parent had provided any explanation as to how Child was so severely injured while in their care.

Mother timely appealed the trial court's finding that Child was a victim of child abuse and that Mother was a perpetrator of that abuse. Mother now argues in her appeal that (a) the trial court relied on conjectural evidence of child abuse while failing to consider Mother's rebuttal evidence that no abuse occurred, and (b) the trial court failed to consider rebuttal evidence showing that even if Child were abused, Mother could not have been the perpetrator because Child was not in her care at the relevant times. **See** Appellant's Brief, at 5.[4]

## II.

## A.

Mother's first claim is that the trial court abused its discretion in determining that Child was the victim of child abuse.[5]

---

[4] Mother had raised two other issues in her 1925(b) statement, but they were later withdrawn as moot. **See** Appellant's Brief, at 5-6. Separate briefs were filed on behalf of Child and DHS and Father did not file a brief since he is not a party to this case.

[5] A trial court's findings as to a petition to terminate parental rights are reviewed under an abuse of discretion standard. **See In the Interest of J.D.**, 798 A.2d 210, 213 (Pa. Super. 2002). The reviewing court must accept the findings of fact and credibility determinations of the trial court as long as they are supported by the record. **See In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly
*(Footnote Continued Next Page)*

Under 23 Pa.C.S. § 6381(d), there is a rebuttable presumption that child abuse has occurred where a child has been injured in some way that would not "ordinarily" occur but for an instance of child abuse:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d); *see also See Interest of A.C.*, 237 A.3d 553, 562 (Pa. Super. 2020) (The statutory presumption applies where a dependency petitioner can show that the child's injury would not ordinarily have been sustained but for the acts or omissions of the respondent).

Once a court applies this presumption, the burden shifts to the parent or caregiver to show that the injuries sustained by the child were not the result of child abuse. *See In re L.Z.*, 111 A.3d 1164, 1185 (Pa. 2015). The "[e]valuation of the validity of the presumption . . . then rest[s] with the trial court evaluating the credibility of the *prima facie* evidence [of abuse] and the rebuttal of the parent or responsible person." *Id*. For these purposes, child abuse is defined as "intentionally, knowingly or recklessly doing any of the following: (1) causing bodily injury to a child through any recent act or failure to act." 23 Pa.C.S. § 6303(b.1).

---

unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007).

Here, contrary to Mother's claim, the trial court properly applied the statutory presumptions of Section 6381 and acted within its discretion in weighing the conflicting evidence of child abuse:

> [The trial court] determined that its finding of child abuse as to Mother was supported by clear and convincing evidence and that A.M. was without proper care and control. **Ultimately, this Court's decision to find child abuse as to Mother rested on which expert witness the Court found more credible**. This Court found Dr. Bennett's testimony more credible and compelling than Dr. Scheller's testimony. Dr. Bennett and the CHOP team were the treating physicians for A.M. when she arrived at the hospital on September 10, 2020, and they had direct knowledge of the injuries she sustained. Dr. Bennett evaluated A.M., reviewed her medical history and records from Nazareth, and conducted interviews with A.M.'s parents in preparation for her consultation report. Dr. Scheller did not evaluate A.M., nor did he speak to physicians at Holy Redeemer, Nazareth, CHOP, or any family members. Dr. Bennett credibly testified that A.M. sustained numerous, severe, near-fatal injuries. These injuries included acute bilateral subdural and subarachnoid hemorrhages as well as acute, severe, multi-layer retinal hemorrhages that were "too numerous to count." A.M. also suffered seizures and required life-saving intervention such as seizure medications and intubation with a ventilator as a result of these near-fatal injuries.

Trial Court Opinion, 4/22/2022, at 18-19 (emphasis added).

As to Mother's rebuttal evidence that no child abuse occurred, the trial court found it significant that Dr. Bennett had disputed Dr. Scheller's conclusions on several grounds:

> . . . Dr. Bennett credibly testified that [A.M.'s] injuries were not caused by a pre-existing condition arising from a complication at birth as Dr. Scheller suggested. A.M. was not diagnosed with pre-existing conditions at birth nor by any physicians who treated her since birth. Dr. Bennett stated that if A.M.'s injuries were the result of birth trauma, she would have been symptomatic for these injuries prior to five weeks after she was born. Additionally, if A.M.'s retinal hemorrhages were the result of a traumatic birth,

they would have healed by the time A.M. presented at CHOP. A.M.'s hemorrhages were also toward the front of the brain, whereas birth-related trauma typically results in hemorrhages toward the back of the brain, which makes the injuries more consistent with inflicted trauma. Dr. Bennett further testified within a reasonable degree of medical certainty that A.M.'s injuries occurred within "days to a week" prior to her admission to CHOP on September 10, 2020. While Dr. Scheller presented a thorough explanation of how he believed A.M. sustained these injuries, the medical evidence demonstrates that A.M.'s injuries did not result from birth trauma but were consistent with nonaccidental trauma and child abuse.

*Id*. at 19-20. Moreover, neither Mother nor Father could give any explanation for how Child had sustained such acute, life-threatening injuries while in their care. *See id*. In short, the trial court simply found the evidence of abuse more credible than the rebuttal evidence provided by Mother. Such determinations – relating to the credibility of witnesses and the weight of the evidence – are within the discretion of the trial court, and we find no legal or factual basis in the record here to suggest that the trial court abused that discretion in finding that Child was a victim of abuse. *See In re L.Z.*, 111 A.3d at 1185; *see also See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

**B.**

Mother's second claim is that the trial court abused its discretion in determining that Mother was the perpetrator of child abuse against Child. In her brief, Mother emphasizes that she could not have been responsible for any child abuse that may have occurred because Child was not directly under her supervision on the evening in which Child received emergency medical care. Mother argues that Child was in the care of Father when she first presented

- 9 -

with a life-threatening medical condition, and that prior to that point, when Child was in Mother's custody, Child's medical condition was not indicative of child abuse.

After reviewing the record evidence and the trial court's 1925(a) opinion, we conclude that the trial court did not abuse its discretion in finding that Mother was responsible for the abuse of Child. As previously discussed, under 23 Pa.C.S. § 6381(d), Mother was a caregiver of Child, and since the trial court relied on competent evidence to rule that child abuse occurred, the burden rested with Mother to rebut her presumptive responsibility for that abuse. *See* Trial Court Opinion, 4/22/2022, at p. 21 ("[T]he evidence clearly established that Mother and Father were the primary caregivers for A.M. at the time of her injuries and that A.M.'s injuries occurred while A.M. was in their primary care."); *see also See Interest of C.B.*, 264 A.3d 761, 772 (Pa. Super. 2021) (a child's caregiver does not have to be physically present with a child in order to be held liable for an injury that a child sustains).

Here, Mother failed to rebut the presumption that she was responsible for Child's acute, non-accidental injuries. Although she claims that any child abuse would have had to occur when Child was in Father's custody on the evening of September 9, 2020, the evidence does not establish that. Mother did not present the testimony of the physicians who purportedly treated Child two prior days, and the trial court did not credit Mother's claims that those physicians detected no acute injuries at those times.

Further, both Mother's expert witness and the expert witness for DHS testified that it was impossible to determine whether Child had suffered an acute injury within the narrow timeframe in which Father had physical custody on the evening in question. In fact, Dr. Bennett testified that Child's injuries could have been inflicted between one day and one week from the time Child was given emergency care on September 9, 2020. The trial court did not abuse its discretion in crediting Dr. Bennett's testimony or in finding that Mother had failed to rebut the presumption that she was responsible for the child abuse inflicted on Child. *See Interest of S.L.*, 202 A.3d 723, 730 (Pa. Super. 2019) (It is "within the trial court's ultimate purview" whether to credit or reject a caregiver's rebuttal evidence). Thus, the order on review must stand.

Order affirmed.

*Judgment Entered.*

_____

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/8/2022*