J-S11016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.A.-H., FATHER | : | |
| | : | |
| | : | No. 2741 EDA 2022 |

Appeal from the Order Entered September 26, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000237-2022,

BEFORE:  OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED JUNE 9, 2023**

N.A.-H. ("Father") appeals from the order adjudicating as dependent his child, N.S. ("Child"). We affirm.

In January 2022, the Philadelphia Department of Human Services ("DHS") received a General Protective Services ("GPS") report alleging safety concerns for three-week old Child due to Child's mother's ("Mother")[1] mental health issues. N.T., 9/26/22, at 10. DHS determined the GPS report was valid and placed Child with her maternal grandmother ("Maternal Grandmother") pursuant to a safety plan. *Id.* at 10-11, 31-32. At that time, Mother was hospitalized for mental health treatment and DHS did not have contact

---

[1] Mother stipulated to the adjudication of Child and is not a party to this appeal. *See* N.T., 9/26/22, at 134.

information for Father. ***Id.*** at 32. DHS subsequently filed a dependency petition on behalf of Child, on March 10, 2022.

An adjudicatory hearing was initially scheduled for March 25, 2022, but was continued several times. The hearing was eventually held on September 26, 2022. At that hearing, the court expressly incorporated by reference all the testimony taken over the prior seven court dates. ***Id.*** at 42-44, 162-164. Those prior hearings were on March 25, May 6, June 3, June 6, July 21, August 19, and September 14, 2022.

At the initial hearing on March 25, 2022, the court continued the case because the court appointed Father's counsel at the hearing, and DHS had not served Mother with notice of the hearing. N.T., 3/25/22, at 10. Neither Mother nor Father appeared at the hearing.

At the next hearing, on May 6, 2022, DHS requested a continuance because Mother had not been served. N.T., 5/6/22, at 6. Father was hospitalized at a mental health facility in Virginia. ***Id.*** at 12, 17. Prior to his hospitalization, Father and Mother had been living together in New Jersey. ***Id.*** at 6, 12.

Father appeared at the subsequent hearing, on June 3, 2022, and stated that he did not want an attorney. N.T., 6/3/22, at 7. The court vacated the order appointing Father's counsel and appointed him new counsel. ***Id.*** at p. 9-10. Father became irate and stated that the court wanted "a fuckin' electrocution" and that the case involved "a rape and baby death." ***Id.*** at 7-8. The court ordered the sheriff to remove Father from the courtroom due to

his disruptive behavior and outburst. *Id.* at 8, 10. It also ordered DHS to obtain an Order of Protective Custody ("OPC") for Child so DHS would have temporary legal custody of Child, and Maternal Grandmother would have temporary physical custody. *Id.* at 11-12, 15.

At the next hearing, on June 6, 2022, the court was informed that DHS had obtained an OPC. N.T., 6/6/22, at 4. The Community Umbrella Agency ("CUA") caseworker, Eileen Groark, testified that Father and Mother had mental health issues and that although Mother had a Protection from Abuse ("PFA") order against Father, Father was not adhering to it. *Id.* at 12. Groark stated that Maternal Grandmother was very fearful of Father, and he told her he was going to kill the employees at Maternal Grandmother's daycare. *Id.* at 11-12. The court issued a "stay away" order requiring Father to keep away from Maternal Grandmother. *Id.* at 13, 20.

Mother and Father did not appear at the next hearing, on July 21, 2022. Groark testified that Father was awaiting a bed at a mental health inpatient hospital in York, Pennsylvania. N.T., 7/21/22, at 16. The court denied Mother and Father's request to participate in the hearing by phone for two reasons. *Id.* at 5. First, the court was not equipped to accommodate both Mother and Father by phone. *Id.* Second, the court explained that it would be unable to manage Father if he participated by phone due to his outburst and removal from the courtroom at the June 3 hearing. *Id.* at 5-6. The court granted Father's counsel's request for a continuance due to Father's hospitalization. *Id.* at 5; N.T., 8/19/22, at 9. The court also granted Father's motion for

- 3 -

discovery and ordered DHS to provide counsel with all documents and witnesses it intended to produce at the adjudicatory hearing in accordance with the Child Protective Services Law. N.T., 7/21/22, at 7-8.

At the following hearing approximately one month later, on August 19, 2022, Father was present and Mother participated by phone. However, the case was continued because DHS had not turned over the court-ordered discovery to Father. N.T., 8/19/22, at 12, 15. The court ordered DHS to provide the discovery within seven business days. *Id.* at 15. Father's counsel expressed Father's desire to have custody of Child and noted that the dependency petition did not specifically allege that Father posed a danger to Child. *Id.* at 27. The court stated that it was not going to change Child's placement until it heard all the facts and evidence. *Id.* at 28. The court noted that no visitation schedule for Father had been established due to Father being in and out of mental health hospitals and out-of-state at times. *Id.* at 28-31. The court ordered that Father have supervised visits at DHS. *Id.* at 32, 34.

At the hearing the following month, on September 14, 2022, DHS requested a continuance because the DHS caseworker was not available. N.T., 9/14/22, at 9. DHS had also turned over to counsel 400 pages of discovery the night before the hearing. *Id.* The Child Advocate joined DHS's request for a continuance because she had not had time to review all the discovery. *Id.* at 11. Father's counsel objected to the request for a continuance and requested that Father have custody of Child. *Id.* The court granted the

continuance, over Father's objection. *Id.* at 20. The court then heard permanency review testimony from Groark.

Groark testified she tried to reach Father to set up a visitation schedule, but Father did not respond. *Id.* at 13-14. The court attempted to ask Father directly about his availability for visitation, but his response was illogical. He stated this was a "criminal case" and, "[Y]ou can remove my name from the birth certificate because it was a fetal abduction and spousal [sic]. It is a rape and freaking kidnapping. I don't need to talk to DHS." *Id.* at 14-15. The court noted that Father's lack of cooperation with DHS would preclude establishing a visitation schedule and stated to Father, "[W]hat you have articulated on the record is very concerning and would give me concern of returning this child to your custody at this point." *Id.* at 16, 17. Father responded that keeping him away from Child was "treason" and he again requested that he be removed from the birth certificate, stating, "I don't want the child." *Id.* at 30-31.

At the adjudicatory hearing on September 26, 2022, as noted above, the court incorporated by reference the testimony from the previous seven hearings. N.T., 9/26/22, at 42-44, 162-164. Father and Mother were both present. DHS identified the safety threats in this case as mental health concerns for Father and Mother, as well as concerns about domestic violence. *Id.* at 86. Mother had two active PFA orders against Father in New Jersey, which Father conceded. *Id.* at 130-31. Mother testified that she was afraid, anxious, and in fear of her life because of Father and requested a stay away

order for Father, which the court granted. *Id.* at 128-131. Both the DHS investigator, Racquel Braham, and the CUA worker, Groark, testified that they had tried to contact Father by phone many times but he was always upset, hostile, and yelling. *Id.* at 18-19, 22-23, 23-28, 71-74. Groark opined that Child would not be safe in Father's care because of Father's uncooperativeness and hostility. *Id.* at 94-95. She stated that Father's case objectives were to obtain mental health treatment, attend parenting classes, maintain communication with DHS, and visit with Child. *Id.* at 95-97.

Father testified that he wanted "a hundred percent" custody of Child and visitation with Child but did not want to go through CUA. *Id.* at 137. He claimed that the police were stalking him, he was "trafficked," his mental health hospitalizations were involuntary, and his email had been hacked by "a criminal court, some random person, or another country." *Id.* at 139-40, 151. He said that he did not currently have a permanent residence and had been living in hotels since October 2021, approximately one year before the adjudicatory hearing, when he was evicted from his home. *Id.* at 161, 180-81. Father stated, "I am facing homelessness and living in a shelter." *Id.* at 182.

The court adjudicated Child dependent based upon Father's and Mother's present inability to care for Child due to Father's mental health issues and lack of housing and Mother's mental health issues. *Id.* at 164-65. The court found the testimony of both the DHS and CUA caseworkers to be credible

and that DHS had made reasonable efforts to prevent placement of Child. **Id.** at 164, 165, 171. This appeal followed.

Father raises the following issues for our review:

1. Whether the trial court erred as a matter of law or abused its discretion in finding that the Philadelphia Department of Human Services met its burden to prove, by clear and convincing evidence, that [Child] was a dependent child[?]

2. Whether the trial court erred as a matter of law or abused its discretion in finding that the Philadelphia Department of Human Services met its burden to prove that it was clearly necessary to remove [Child] from her parents' care[?]

3. Whether the trial court erred as a matter of law in making the pre-placement finding required by 23 Pa.C.S.A. § 6351(b)(2) of the Pennsylvania Juvenile Act, by determining that the Philadelphia Department of Human Services made reasonable efforts to prevent or eliminate the need for the removal of [Child] from her parents' care[?]

4. Whether the trial court erred as a matter of law when it ordered that [Child] remain in the temporary custody of the Philadelphia Department of Human Services in violation of 42 Pa.C.S.A. Section 6335 where [Child] was held in temporary care for longer than ten days and where the requisite findings of Section 6335 were not made[?]

Father's Br. at 3.

In his first issue, Father argues that the trial court erred by finding that clear and convincing evidence supported the conclusion that Child lacked parental care and control. **Id.** at 15. He asserts that DHS never assessed Father to determine if he could care for Child, and he was left out of the process from the beginning of the case. **Id.** at 17. He points out that the GPS report did not reference Father, and Father was not invited to the initial safety

plan meeting or offered a visitation plan. *Id.* Father also asserts that DHS never assessed his home. *Id.* Father concedes that, at various times, he received mental health treatment but argues that "receiving mental health treatment is not a bar to caring for one's child." *Id.* at 18.

We review orders entered in dependency cases for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We must accept the findings of fact and credibility determinations if they are supported by the record, but we are not required to accept the trial court's inferences or conclusions of law. *Id.*

A "dependent child" includes a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302 ("Dependent child"). Thus, a child will only be declared dependent if the child "is presently without proper parental care and when such care is not immediately available." *In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (citation omitted). "This Court has defined 'proper parental care' as 'that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.'" *Id.* (citation omitted).

The petitioner must demonstrate by clear and convincing evidence that a child meets the statutory definition of a dependent child. *In re G.T.*, 845 A.2d 870, 872 (Pa.Super. 2004). Clear and convincing evidence is evidence that is "so clear, direct, weighty, and convincing as to enable the trier of facts

- 8 -

to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re A.B.*, 63 A.3d at 349 (citation omitted).

The record supports the court's determination that Father was presently unable to parent Child due to his mental health issues and lack of housing and that Child was therefore dependent. *See* 42 Pa.C.S.A. § 6302; *In re A.B.*, 63 A.3d at 349. Although Father argues that DHS did not assess his home, he readily admitted at the adjudicatory hearing that he did not have a permanent residence and was "facing homelessness." *See* N.T., 9/26/22, at 161, 182. Furthermore, Father was hospitalized on multiple occasions for mental health treatment and was uncooperative and hostile with DHS and CUA. Father also had a history of domestic violence against Mother, as evidenced by the two active PFA orders against him in New Jersey. Both Mother and Maternal Grandmother stated that they were very fearful of Father, and the trial court issued orders directing Father to stay away from them.

Further, the court was well within its purview when crediting the testimony of the DHS and CUA caseworkers. The court also witnessed firsthand Father's in-court incoherent and angry outbursts. Accordingly, we discern no abuse of discretion by the trial court in determining that DHS presented clear and convincing evidence that Child was dependent.

Father's second issue challenges the trial court's determination that DHS met its burden to prove that it was clearly necessary to remove Child from her parents' care. Father's Br. at 18. He argues that the court failed to consider alternative dispositions other than the removal of Child from her home. *Id.* at

19. Father contends that there was no testimony that he was a safety threat to Child or any "testimony regarding his home." *Id.* According to Father, the "trial court could have ordered a disposition that the Child remain with Father, under the supervision of the agency." *Id*.

After a child has been adjudicated dependent, "a court may not separate that child from his or her parent unless it finds that the separation is clearly necessary." *Interest of A.C.*, 237 A.3d 553, 563 (Pa.Super. 2020) (citation omitted). "Such necessity is implicated where the welfare of the child demands that he or she be taken from his or her parents' custody." *Id.* (citation omitted).

Here, the record demonstrates that Child's removal from her parents' custody was clearly necessary. Child was removed from Mother's care as Mother conceded that she was not presently able to care for Child. Father's argument that Child should have "remain[ed]" with him is misguided since Child was never in Father's care. Moreover, contrary to Father's contention that there was no testimony regarding his housing, Father himself testified that he presently had no permanent home. Given the young age of Child, the trial court had ample evidence to conclude that Child's removal from her parents' care was clearly necessary.

Father next argues that the court erred when it determined that DHS made reasonable efforts to prevent Child's removal from her parents' care. Father's Br. at 20. He contends that "the trial court here provided no analysis of whether DHS made any efforts to prevent the placement of the Child." *Id.*

Father again maintains that DHS did not invite Father to the safety plan meeting, provide him with a visitation plan, or assess his home. *Id.* According to Father, "the fact that [he] was not invited to or involved with the safety plan [that] was considered to keep the family together, especially after the GPS report only mentioned issues with Mother, belies the finding that DHS made reasonable efforts." *Id.* at 23.

Prior to entering an order of disposition that removes a dependent child from his or her home, "the court shall enter a finding concerning whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his [or her] home, or if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances[.]" *Interest of K.C.*, 156 A.3d 1179, 1185 (Pa.Super. 2017) (citation and internal quotation marks omitted).

Here, the record contradicts Father's assertion that the trial court failed to address whether DHS made reasonable efforts to prevent Child's placement. The court specifically made a finding of reasonable efforts at the adjudicatory hearing and in the adjudication order. At the hearing, the court stated, "[The c]ourt is going to find that DHS did make reasonable efforts to prevent placement. Initially, DHS sought to implement a safety plan in Maternal Grandmother's home with Mother and Maternal Grandmother, and that was not successful." N.T., 9/26/22, at 171. The order of adjudication similarly found, "[T]he [c]ourt hereby finds that to allow this child to remain

- 11 -

in the home would be contrary to the child's welfare, and that the Philadelphia Department of Services made Reasonable Efforts to prevent or eliminate the need for removal of this child from the home." Order, 9/26/22, at 1-2.

There was sufficient evidence to support the finding that DHS made reasonable efforts. Father's argument about the failure to include him in the preparation of the safety plan is misplaced. At the time of the safety plan meeting, DHS did not have contact information for Father. As for his complaints that DHS did not provide him with a visitation plan or assess his home, the caseworkers testified that they repeatedly attempted to contact Father, and he was always angry, yelling, and uncooperative. Father's argument is without merit.

Lastly, Father contends that the court violated the Juvenile Act when it ordered that Child remain in the temporary custody of DHS, as Child was held in temporary care for longer than 10 days. Father's Br. at 23. Citing Section 6335, Father argues that if a child is placed in protective custody pending a dependency adjudication, the trial court must schedule the dependency hearing within 10 days of the filing of the petition. *Id.* at 24 (citing 42 Pa.C.S.A. § 6335(a)). He contends that Child was taken into temporary care on June 3, 2022 and was not adjudicated dependent until September 26, 2022, and the court did not make the requisite findings for keeping a child in temporary care for more than ten days. *Id.* at 24-25.

Father's final argument is waived. "To preserve a claim of error for appellate review, a party must make a specific objection to the alleged error

- 12 -

before the trial court in a timely fashion and at the appropriate stage of the proceedings; failure to raise such objection results in waiver of the underlying issue on appeal." **PCS Chadaga v. Torres**, 252 A.3d 1154, 1157 (Pa.Super. 2021).

Here, Father did not raise this claim at any point in the trial court. He only made one objection to the various requests for continuances in the case and he did not cite the 10-day requirement under Section 6335(a) as the basis for his objection. **See** N.T., 9/14/22, at 11. Accordingly, Father's claim is waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/9/2023