J-A05028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2597 EDA 2022 |

Appeal from the Order Entered October 4, 2022,
in the Court of Common Pleas of Montgomery County,
Civil Division at No(s): CP-46-DP-0000107-2022.

BEFORE: LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED AUGUST 21, 2023**

D.M. (Mother) appeals the order issued by the Montgomery County Court of Common Pleas, which dismissed the dependency petition filed by the Montgomery County Office of Children and Youth (Montgomery OCY) and granted sole custody of the parties' six-year-old daughter, S.C. (the Child), to Z.C. (Father). ***See*** P.R.J.C.P. 1409(A)(2). The juvenile court agreed with Montgomery OCY's position that the Child would have been dependent but for the fact that Father was a ready, willing, and able parent. The juvenile court's custody award effectively superseded the parties' prior shared custody arrangement. On appeal, Mother alleges the court lacked jurisdiction and failed to follow the Rules of Juvenile Court Procedure. After review, we affirm.

The record discloses the following factual and procedural history. At the outset, we note that three separate child protective services agencies were

involved with the family: Bucks County Children and Youth Services (Bucks CYS); Lehigh County Children and Youth Services (Lehigh CYS); and Montgomery OCY, which was the agency that filed the subject dependency petition.

In November 2021, the family was under the investigation of the Bucks CYS. Bucks CYS was investigating allegations that Father had sexually abused the Child, but that Mother had coached the Child into making these claims. Bucks CYS had previously dealt with sexual abuse allegations involving Father, and those allegations were deemed unfounded. During its investigation, Bucks CYS removed the Child from Mother's care and obtained an order placing the Child in the care of Paternal Grandfather. *See* N.T., 9/20/22 (Day 1), at 34-35. At the time, Bucks CYS was unable to place the Child in Father's care, because Mother had filed a Protection From Abuse petition against Father on behalf of herself and the Child, and that petition was still pending. *Id.* at 35. Ultimately, Bucks CYS chose not to proceed with a dependency petition. The parents had left the county, and it was agreed that Father would have full custody of the Child, subject to Mother's supervised visits. Bucks CYS still had concerns that Mother was coaching the Child into saying that Father sexually abused her. *Id.* at 38, 39. So at the closure of the Bucks CYS case, Mother and Father were ordered not to discuss allegations of sexual abuse with the Child. *Id.* at 38.

In May 2022, following a hearing officer's recommendation, Mother and Father agreed to share custody of the Child. The agreement was reduced to a custody consent order.

In June 2022, the family came to the attention of Montgomery OCY after it learned Mother went to multiple doctors' offices alleging that Father sexually abused the Child. *Id.* at 50. The referral source also claimed that Mother was aggressive, and that she might be under the influence of drugs. *Id.* When a Montgomery OCY caseworker interviewed Mother and the Child, the Child stated that "Daddy touches me with his fingers," but would not elaborate. *Id.* at 52. The caseworker passed along the disclosure to Lehigh CYS, which was also investigating allegations of Father's sexual abuse. In the interim, Montgomery OCY asked Mother to provide a drug screen, which came back positive for methamphetamine and THC. *Id.* at 53. Because Mother tested positive, and because Lehigh CYS was investigating Father, Montgomery OCY filed a dependency petition.

The juvenile court set the adjudicatory hearing for August 2, 2022. When Mother and the Child failed to appear for the hearing, and their location could not be ascertained, the court issued a bench warrant. Mother and the Child were ultimately found in the home of an unrelated male. The court then issued an emergency protective order, which granted Montgomery OCY emergency custody and placed the Child with Paternal Grandfather. Soon thereafter, Lehigh CYS determined that the sexual abuse allegations against Father were unfounded.

The juvenile court held the rescheduled adjudicatory hearing on September 20 and October 4, 2022. At the hearing, Montgomery OCY recommended that the juvenile court dismiss the dependency petition and grant Father sole custody of the Child. The court agreed and issued such an order on October 4, 2022. Mother timely filed[1] an appeal, wherein she presents the following issues for our review:

1. Did the trial court abuse its discretion or err as a matter of law when, despite the withdrawal on the record of the dependency petition by the solicitor of the Office of Children and Youth, the juvenile court awarded sole legal and physical custody of the child to Father in contravention of the order of the family court that had ordered sole physical custody to Mother?

2. Did the trial court abuse its discretion and/or err as a matter of law by finding Mother to be a drug addict after jurisdiction was withdrawn from the juvenile court by the withdrawal of the dependency petition on the record by the solicitor for the Office of Children and Youth?

3. Did the trial court abuse its discretion and/or err as a matter of law by finding the Child was without appropriate care, protection and support while in Mother's care after jurisdiction was withdrawn from the juvenile court by the withdrawal of the dependency petition on the record by the solicitor for the Office of Children and Youth?

_____

[1] In a children's fast track case, the appellant's concise statement of matters complained of on appeal must be filed concomitantly with the notice of appeal. **See** Pa.R.A.P. 1925(b). Mother failed to comply with this Rule when she filed her concise statement two weeks after her notice. However, we decline to dismiss Mother's appeal notwithstanding the circumvention. **See In re K.T.E.L.**, 983 A.2d 745 (Pa. Super. 2009).

Mother's Brief at 1.

Notwithstanding the presentation of three separate claims, Mother only advances two arguments in her Brief; insofar as we can discern, Mother collapses her second and third issue into a single contention.[2] First, Mother argues that the juvenile court lacked jurisdiction to award Father sole custody. Second, Mother argues that even if the juvenile court had jurisdiction, its order was erroneous because the court failed to make the requisite findings before it could award Father sole custody. Both arguments present questions of law. Thus, we begin with our observation of the appropriate scope and standard of review:

> We review orders in dependency cases by accepting the findings of fact and credibility determinations of the trial court if they are supported by the record. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We are not, however, required to accept the trial court's inferences or conclusions of law. *See id.* The appellate court must ensure that the record represents a comprehensive inquiry and that the trial court has applied the appropriate legal principles to the record. *See In re L.B.*, 229 A.3d 971, 977 (Pa. Super. 2020). If the question before us is a question of law, […] the scope of review is plenary. *See in re K.L.S.*, 934 A.2d 1244, 1246 (Pa. 2007).

*Interest of J.B.*, 247 A.3d 447, 448 (Pa. Super. 2021).

---

[2] We caution counsel to be mindful of Pa.R.A.P. 2119(a) (providing that the argument section of the brief shall be divided into as many parts as there are questions to be argued).

We add that when the question presented is a question of law, the standard of review is *de novo*. ***See, e.g., In re G.D.***, 61 A.3d 1031, 1036 (Pa. Super. 2013).

**1. Whether the juvenile court had jurisdiction to enter its order dismissing the dependency petition and granting Father custody of the Child.**

The Juvenile Act defines a dependent child as, ***inter alia***:

> A child who:
>
> (1)  is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk;
>
> […]

42 Pa.C.S.A. § 6302.

Following an adjudicatory hearing, the court shall enter an order as to whether the child is dependent. ***See*** Pa.R.J.C.P. 1409(A). At that point, the court may make one of two determinations. Either the court finds the child is dependent under Rule 1409(A)(1), or the court finds the child is not dependent under Rule 1409(A)(2), which provides:

> (2) *No dependency.* If the court finds the child not to be dependent **or the court finds a parent ready, willing, and able to provide proper parental care or control**, the court shall:
>
> (a) **dismiss the petition**;
>
> (b) order the child to be discharged from custody and any restrictions ordered in the proceedings; and
>
> (c) enter an order identifying individual(s) who will have the legal and physical custody until such order is modified by further order of the court.

Pa.R.J.C.P. 1409(A)(2)(a)-(c) (emphasis added).

Instantly, the juvenile court determined that Father was ready, willing, and able to provide proper parental care and control under Rule 1409(A)(2). Consequently, the court dismissed the dependency petition under Rule 1409(A)(2)(a) and entered an order granting Father custody under Rule 1409(A)(2)(b)-(c).

In her first appellate issue, Mother argues the juvenile court lacked jurisdiction to award Father custody. Her argument is predicated on the fact that the assistant solicitor for Montgomery OCY used imprecise terminology during the adjudicatory hearing. At various points throughout the proceedings, the assistant solicitor stated it was Montgomery OCY's position that the dependency petition had been, or should be, "withdrawn." **See, e.g.,** N.T. (Day 1) at 7; 87.[3] Mother claims that because Montgomery OCY sought

---

[3] Specifically, the Montgomery OCY Solicitor stated: "…our recommendation today is that the dependency petition shall be withdrawn and father is a fit and willing parent to take custody of this child." **See** N.T. (Day 1) at 7.

to withdraw its petition, the juvenile court lacked jurisdiction to issue an order under the Juvenile Act superseding the parties' prior shared custody order.

Mother's argument strains credulity. The position of the assistant solicitor was clear: Montgomery OCY recommended that the court find Father to be a ready, willing, and able parent; and that the court dismiss the petition in accordance with Rule 1409(A)(2)(a). Notwithstanding the assistant solicitor's occasional use of the term "withdraw," there could be no confusion as to what Montgomery OCY actually sought. The assistant solicitor made its position clear from the outset of the proceedings. *See id.*, at 3, 7. Indeed, the assistant solicitor used the terms "withdraw" and "dismiss" interchangeably:

> **The court**: So you [(assistant solicitor)] are essentially asking that the dependency petition be dismissed and if there are any custody issues that need to be changed that they be handled by the family court unit. Is that essentially what ---.
>
> **Solicitor**: That's correct, Your Honor. That is exactly what we are asking. That the court dismiss the petition and place custody with Father and any other issues with regard to that go to family court and notice to all parties with regard to any future hearings as [well] as court orders are provided when it goes to family court, so the judge knows what is going on when they have to address any issues with regards to custody.

*Id.* at 83-84.

> **The court**: But at the point – if I go along with [OCY's] proposal, you are asking me to allow physical

- 8 -

and legal custody to be placed with Father; therefore, OCY is out of the picture?

**Solicitor**: Correct, Your Honor. We are asking the court to *dismiss* the petition. It has been *withdrawn* by OCY. We are asking that it be *dismissed* and the court orders that pursuant to Rule 1409 that Father is a fit and willing parent and then they can go fight it out all they want in family court.

*Id.* at 87 (emphasis added).

This was not a case where, say, an agency had of change of heart and sought to stop the adjudicatory hearing in its tracks – only for the juvenile court to take the reins away from the moving party and charge full steam ahead. Nor was it the case, as Mother alleges, that Montgomery OCY resorted to "semantical word games" to help Father obtain a backdoor custody modification. *See* Mother's Brief at 4, 8-9. According to Mother, Montgomery OCY "in collusion with Father, used the juvenile court to gain custody of S.C. and avoid an evidentiary hearing on custody in family court." *Id.* at 16.

Mother's forceful repudiation of the Agency's position evinces a misunderstanding of the Agency's duty to protect children of the Commonwealth. At the hearing, Montgomery OCY took the position that Mother posed a risk to the Child's safety, but that government intervention was ultimately not appropriate, because Father was available to provide suitable care. The assistant solicitor explained that the only reason the Child had not been returned to Father's care sooner, was because of the open investigation with Lehigh CYS. *See* N.T., 10/4/22 (Day 2) at 3. By the time

the court held the adjudicatory hearing, Lehigh CYS had determined that the allegations against Father were unfounded, and Montgomery OCY had no other concerns about Father's ability to care for the Child. *Id.* at 3-4. Still, by virtue of its dependency petition, Montgomery OCY hedged; if the court disagreed with the Agency's belief that Father was an appropriate caregiver, then the Agency was prepared to go forward due to its concerns about Mother's ability to care for the Child. Simply because the respective positions of Father and the Agency aligned at the hearing, does not mean the two were nefarious confederates attempting to deprive Mother of custody without due process. The position of Montgomery OCY was perfectly reasonable. And as we explain below, Mother's rights were safeguarded by proper procedures.

We do not deny that law often turns on exact language, that something as simple as a comma could have consequences which are as drastic and they are unforeseeable.[4] Here, however, we decline to put form over substance and reverse a juvenile court's careful determinations regarding the safety of the Child, simply because the assistant solicitor misspoke. For these reasons, we find Mother's first appellate issue is entirely without merit.

---

[4] Indeed, we question whether it would have been more grammatically appropriate for Rule 1409(A)(2)(a) to provide for the "denial" of the petition, as opposed to its "dismissal." *See also Interest of J.B.*, 247 A.3d 447 (Pa. Super. 2021) (referring to the "discharge" of the dependency petition, under Rule 1409(A)(2)(a)).

2. **Whether the juvenile court committed a procedural error when it dismissed the dependency petition without first determining Mother could not provide proper care to the Child?**

Regarding her second and third appellate issues, Mother argues that the juvenile court's order was erroneous, because it failed to follow proper procedures. Mother maintains that before the court could dismiss the dependency petition and award Father custody, the court had to first determine that Mother could not properly care for the Child. According to Mother, the court failed to make this requisite finding and thus its order was erroneous.

We agree with Mother's interpretation of the law, up to a point. A court is empowered by 42 Pa.C.S.A. § 6341(a) and (c) to make a finding that a child is dependent, if the child meets the statutory definition by clear and convincing evidence. However, the definition of a dependent child contained in Section 6302 clearly states that a child must lack a parent (or guardian or other legal custodian) who can provide appropriate care to the child. A child whose non-custodial parent is ready, willing and able to provide such care does not meet this definition. **See In re M.L.**, 757 A.2d 849, 851 (Pa. 2000).

This Court has explained:

> [I]t is the duty of the trial court to determine whether the non-custodial parent is capable and willing to render proper parental control prior to adjudicating a child dependent. If the court determines that the custodial parent is unable to provide proper parental care and control "at this moment" and that the non-custodial parent is "immediately available" to provide such care, the child is not dependent under the provisions of the Juvenile Act. Consequently, the court must grant custody of the allegedly dependent child to the non-

- 11 -

custodial parent. Once custody is granted to the non-custodial parent, "the care, protection, and wholesome mental and physical development of the child" can occur in a family environment as the purpose of the Juvenile Act directs. 42 Pa.C.S.A. § 6301(b).

*In Interest of Justin S.*, 543 A.2d 1192, 1200 (Pa. Super. 1988); *see also M.L.*, 757 A.2d at 851.

Courts are keenly aware of "the implications of saddling a parent with the state involvement that accompanies an adjudication of dependency when such an intrusion is unwarranted." *Interest of J.B.*, 247 A.3d 447, 451 (Pa. Super. 2021). Courts are also aware how so-called "crossover cases" – *i.e.,* cases involving both the family court and the juvenile court – may necessitate orders that undo the family's prior custody arrangement. We can appreciate how it must seem unfair to Mother, that a child protective services agency can intervene in the family's custody dispute, put a thumb on the scale such that the court deprives her of custody, only for the agency to bow out after the entry of the order.

However, the Rules of Juvenile Court Procedure anticipate the existence of prior custody orders and safeguard against undue intervention. Before a juvenile court can issue an order modifying a family's prior custody arrangement under Rule 1409(A)(2), the court must first render heightened findings.

Specifically, the court must determine, after an evidentiary hearing, that the custodial parent is currently unable to provide proper parental care. *J.B.*, 247 A.3d*.* at 451, 455; *see also* Pa.R.J.C.P. 1409 – Comment ("A trial court

has the authority to transfer custody or modify custody to the child's non-custodial parent without a finding of dependency if sufficient evidence of dependency would have existed but for the availability of the non-custodial parent. ***In Interest of Justin S.***, 543 A.2d 1192 (Pa. Super. 1988.")). We reiterate that the burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets the statutory definition of dependency. ***Interest of A.C.***, 237 A.3d 553, 563 (Pa. Super. 2020) (citation omitted).[5] Thus, to modify a custody order in favor of the non-custodial parent, the court must first determine, based on clear and convincing evidence, that the child would have met the statutory definition of a dependent child, but for the availability of the non-custodial parent.

In addition to these heightened findings, we note that the Rules anticipate that such an award will be revisited. As noted above, Rule 1409(A)(2)(c) requires the juvenile court to identify the "individual(s) who will have legal and physical custody ***until such order is modified by further order of court.***" Pa.R.J.C.P. 1409(A)(2)(c) (emphasis added).

On appeal, Mother argues the juvenile court never made the requisite finding that the Child would have been dependent (due to Mother's inability to care for the Child) but for the availability of Father. ***See*** Mother's Brief at 20.

---

[5] "Clear and convincing evidence" is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***A.C.***, 237 A.3d at 558 (citation omitted).

Mother claims that Montgomery OCY did not provide "a scintilla of evidence" to prove its case. *Id.* at 22.

Contrary to Mother's characterization, the juvenile court made considerable findings that the Child would have been dependent but for Father's availability. *See* Trial Court Opinion (T.C.O.), 12/1/22, at 4 (*infra*). Critically, the court rendered these findings after an evidentiary hearing. *See* *J.B.*, 247 A.3d at 451, 455. The question becomes whether those findings constituted sufficient evidence that Mother was unable to provide "proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." *See* 42 Pa.C.S.A. § 6302 (defining "dependent child").

The juvenile court determined:

> Following Rule 1409(A) guidelines, the court looked at several pieces of evidence to determine that the Child was not [] dependent and awarded custody to Father, not Mother. The allegations against Father were unfounded, thereby making Father a fit and able parent pursuant to Rule 1631(B)[Footnote omitted]. For Mother, however, OCY presented several pieces of evidence to the court to make a sufficient determination that Mother was not a willing and fit parent to the Child.
>
> One was Mother's positive drug test result for Methamphetamine and THC.[6] There is substantial evidence on the record that supports the court's ruling on Mother's drug test results. Counsel for OCY introduced evidence that Mother's drug test results tested positive for Methamphetamine and THC. Mother tried to offer evidence

---

[6] We note that Mother's doctor testified that Mother has a medical marijuana card. *See* N.T. (Day 1), at 24.

that the medication [(Adderall)] being taken for her ADD could produce a false positive. However, OCY offered expert testimony in the form of a toxicologist, Erika Walker, directly rebutting Mother's argument by testifying that the drug test went through a confirmatory process of the results and ruled out possibilities of false positives.

Mother failed to offer any compelling evidence to conclude otherwise. The only evidence Mother was able to offer was testimony from her family Doctor Thomas G. Wilson, who is not a certified expert toxicologist. Dr. Wilson testified that he prescribed her Adderall to treat Mother's ADD. Dr. Wilson confirmed that Adderall will test positive for Amphetamine, not Methamphetamine.

In addition, Mother's history of conduct with the court supports a determination of the court finding Mother unfit. Mother failed to appear at an adjudication hearing on August 2, 2022 and a bench warrant was issued for Mother's arrest for failing to appear and taking the Child to an unknown location. (The Child told the caseworker that she was hiding with an unrelated male, [J.A.], for the past week because Mother told her they had to hide from the caseworker and the police.) Mother also had a history of making false sexual abuse allegations against Father, all of which were deemed unfounded.

Trial Court Opinion (T.C.O.), 12/1/22, at 4 (citations to the record and original footnote omitted)(style adjusted).

As the record stands, Mother's use of marijuana does not seem particularly worrisome, especially in light of the fact that she had a valid medical marijuana card. The positive test for methamphetamines was more troubling. On that point, we acknowledge that the testimony was contested. The toxicologist explained that when there is a presumptive positive test, as there was here for methamphetamine, the sample is put through a confirmatory process. The expert toxicologist stated that in her experience,

she has never seen Adderall produce a false positive for methamphetamine. *See* N.T. (Day 1) at 19.

According to the juvenile court, Mother's doctor testified that Mother's prescribed Adderall will not result in a positive test for methamphetamine. *See* T.C.O. at 4. But that averment was not the doctor's complete testimony. The doctor clarified on re-direct examination that he has seen Adderall cause a false positive for methamphetamine enough times that it concerns him. *See* N.T. (Day 1) at 30-31. Be that as it may, the juvenile court was free to weigh the toxicologist's expert testimony more heavily than that of Mother's family doctor. The court's reliance on the toxicologist's testimony, over the family doctor's, was not improper.

Upon review, we conclude that the juvenile court followed the appropriate procedures when it dismissed the dependency petition and awarded Father custody of the Child. First, the court held an evidentiary hearing and determined there was sufficient evidence of dependency due to Mother's lack of proper parental care. The Juvenile Act provides that evidence of a lack of proper parental care includes evidence of a parent's use of controlled substances. *See* 42 Pa.C.S.A. § 6302. The court was persuaded by the toxicologist's testimony that Mother's positive test for methamphetamines was not a result of her prescribed medication. Moreover, proper parental care includes care necessary to the Child's physical and mental health. *See id.* We do not ignore the finding that Mother has caused the Child to endure emotional distress by coaxing the Child into making false allegations of sexual abuse

- 16 -

against Father. Next, the court determined that the Child did not meet the definition of dependency, because Father was an available to provide proper parental care. The court was persuaded by the testimony that the allegations of Father's sexual abuse were false. Lastly, in accordance with Rule 1409(A)(2)(c), the court indicated that Mother may seek modification of Father's custody award in family court. *See* Order of Court, 10/4/22 at ¶18.

Briefly, we mention Mother's secondary argument that the juvenile court erred, because the Agency never made reasonable efforts at reunification. *See* Mother's Brief at 25. For support, Mother relies on Section 6351 of the Juvenile Act, which mandates that courts must ascertain whether the child protective services agency made reasonable efforts to prevent or eliminate the need for removal from the child's home, prior to the placement of the child outside of the home. *See* 42 Pa.C.S.A. § 6351(b)(2). Mother seems to reason that, because Montgomery OCY did not make any efforts to alleviate its concerns about Mother's care, the court was barred from placing the Child with Father. But Mother misconstrues this subsection. Section 6351(b) refers to requisite placement findings that the juvenile court must make *after* the child is found to be dependent, but *before* the court enters a dispositional order pursuant to Section 6351(a)(1), (2), (2.1), or (3). As the Child was never found to be dependent, this subsection does not come into play. Mother's argument is without merit because it puts the cart before the horse.

To conclude: the juvenile court did not err when it dismissed the dependency petition and awarded Father custody of the Child, pursuant to

PA.R.J.C.P. 1409(A)(2). The court had jurisdiction to issue its order notwithstanding the assistant solicitor's inadvertent use of the term "withdraw" as it relates to the dependency petition. Moreover, the court followed proper juvenile court procedure. It held an evidentiary hearing and thereafter determined that the Child would have been dependent but for the availability of the non-custodial parent.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/2023